NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2728-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHN C. VAN NESS,[1]

    Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

June 2, 2017

APPELLATE DIVISION

Submitted April 5, 2017 — Decided  June 2, 2017

Before Judges Fuentes, Simonelli and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 13-01-0208.

Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).

Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney for respondent (Paul H. Heinzel, Assistant Prosecutor, of counsel and on the brief; Lisa Sarnoff Gochman, Legal Assistant, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

_____

[1] Defendant is also referred to in the record as John C. Vanness.

This appeal illustrates how a trial judge denied a defendant his right to counsel by failing to enforce the procedural mechanism established by the Legislature and the Supreme Court to determine if a defendant qualifies for representation by the Office of the Public Defender. The judge compounded his error by misapplying State v. King, 210 N.J. 2 (2012), to find defendant was capable of representing himself in this criminal jury trial. Under these circumstances, our only recourse is to reverse defendant's conviction and remand this matter for a new trial.

I

## FIRST PUBLIC DEFENDER APPLICATION

On January 28, 2013, a Monmouth County grand jury indicted defendant John C. Van Ness on three counts of third degree theft by deception, N.J.S.A. 2C:20-4 (counts one, five, and nine); three counts of fourth degree passing a check knowing it will not be honored, N.J.S.A. 2C:21-5 (counts two, six, and ten); three counts of third degree forgery, N.J.S.A. 2C:21-1a(2) (counts three, seven, and eleven); and three counts of third degree uttering a forged instrument, N.J.S.A. 2C:21-1a(3) (counts four, eight, and twelve).

The following day, defendant filed a Uniform Defendant Intake Report (commonly referred to as a "5A")[2] in the vicinage's Criminal Division Manager's Office to support his request to be represented by the Office of the Public Defender. See R. 3:8-3. In the section of the 5A labeled "VIII. Financial Status[,]" defendant averred that he had a $1200 monthly income and owned real estate valued at $1.1 million. The document did not require the applicant to disclose his method of valuation. On the liability side, defendant revealed he had a $1000 per month child support obligation and owed $12,000 in fines to other courts.

On its face, the financial information defendant provided in the 5A was insufficient to make an informed determination about his eligibility to be represented by the Public Defender. Defendant did not reveal the source of his alleged $1200 monthly income, did not submit his most recent income tax returns, and did not provide recent proof of employment, such as a W2 or a letter from an employer. With respect to his house, defendant neither indicated his mother's ownership interest nor provided a municipal property tax assessment statement or other

---

[2] The copy of the 5A in the appellate record was provided to us as part of the State's appendix. The document is redacted to exclude defendant's personal information.

documentation to support the $1.1 million valuation. See N.J.S.A. 2A:158A-14.

Despite these omissions, the vicinage's Criminal Division Manager's Office found defendant ineligible for representation by the Public Defender. Although not reflected in his first 5A, defendant alleges he informed the Criminal Division Manager's Office that he had a fifty percent ownership interest in the house in which he resided with his mother. He also claims the house was heavily leveraged; he had defaulted on his mortgage loan and the property was in the final stages of foreclosure.

Defendant was fifty-two years old at the time he applied to be represented by the Public Defender. He graduated high school in 1979 and attended college for two years, but did not receive a degree. His employment history mainly consists of working at a family-owned motel. He began working at the motel as a teenager and continued until it closed in 2008 due to eminent domain. Defendant then worked sporadically as a driver for a recycling business owned by one of his three older siblings. At the time he submitted his second 5A, his employment status was dubious. Defendant alleged he supported himself doing "odd jobs," but had substantial personal debts outstanding. For example, he is legally obligated to support two of his children

4

and was delinquent in paying his child support obligations, accruing approximately $20,000 in arrears.

## ARRAIGNMENT TO PLEA CUT OFF

On February 19, 2013, defendant appeared before the trial court for arraignment. Rule 3:4-2 describes in detail the procedural steps the trial court must take to protect a defendant's constitutional rights at this critical stage of the criminal process.[3] Despite these safeguards, the record shows the trial judge arraigned defendant, even though he was not represented by counsel. The magnitude of this constitutional deprivation is best revealed by quoting verbatim the most significant parts of the arraignment proceeding:

> THE COURT: This is Mr. John Vanness. Mr. Vanness is a codefendant on the previous matter. He's here on two matters, Indictment 13-01-50 and Indictment 13-01-208 [i.e., this case]. The 208 matter involves theft by deception, bad check[s], forgery, uttering [a] forged instrument, -- it looks like a series of events that occurred during November 2012 in Ocean Township. That was on actually for pre-arraignment, but we are going to arraign him on that today.
>
> In addition, he has a pending violation of probation out of Atlantic County.

---

[3] An arraignment is a critical stage of the criminal process that triggers a defendant's right to counsel under both the Sixth Amendment and Article I, Paragraph 10 of the New Jersey Constitution. State ex rel. P.M.P., 200 N.J. 166, 174 (2009).

Apparently he's on probation at this time. I don't know if it overlaps these incidents.

Mr. Vanness filled out a form 5A and does not qualify for a public defender.

Mr. Vanness, who's going to represent you?

DEFENDANT: At this time, probably myself.

THE COURT: All right. That's fine. A new case came down that said I can't stop somebody from representing themselves even if it's a bad idea for them.[4]

DEFENDANT: Well, at this time, you know . . .

THE COURT: I'm going to let you represent yourself. We're not going to hold the case up because of that representation.

DEFENDANT: No.

THE COURT: You heard what I said about your brother's case. If you can work out a plea offer or a package offer with the State, they'll dismiss against him. They seem to feel they have a pretty good case against you. I will enter not guilty pleas on these two indictments.

. . . .

THE COURT: [W]hen you come back on March 25, 2013, we're going to go to the next step.

DEFENDANT: Absolutely.

---

[4] Although the judge did not name the case, we infer he referred to State v. King, supra, 210 N.J. 2. As we will explain in Section V of this opinion, we do not agree with the judge's characterization of the Supreme Court's holding in King.

THE COURT: And you're familiar with the criminal justice system --

DEFENDANT: Yes, I am.

THE COURT: -- apparently, so you know what's going to come. Their initial plea offer is four years flat. You can negotiate with them on that. By the time we come back next time we'll be ready to move forward in setting any dates for motions, if there are any motions you want to file, so you better start reading up on that.

DEFENDANT: Yes.

THE COURT: If you're going to have an attorney here, have him here for a status.

DEFENDANT: Absolutely.

THE COURT: Because once we start off and get an attorney, after that they are going to have to come in and be ready to go.

DEFENDANT: Okay.

THE COURT: You will be given the discovery and the indictment in this matter. It's downstairs. Because you showed up today, I will issue an ROR bail which means all you have to do is sign for it.

. . . .

THE COURT: All right? You have the notice. You have to be back here on March 25, 2013, at 9:00 a.m. If you fail to appear, an order will issue for your arrest. Do you understand what I have said to you?

DEFENDANT: Yes, I do.

[(Emphasis added).]

As this colloquy shows, the judge did not apprise defendant of his right to have the Assignment Judge or his or her designee review his 5A application and make a final determination of his eligibility to be represented by the Public Defender's Office. N.J.S.A. 2A:158A-15.1. The judge also did not: (1) inquire about defendant's ability or intention to seek private counsel; (2) make any determination about defendant's intention to waive the right to counsel; or (3) assess his capability to represent himself.

Defendant next appeared before the trial judge on March 25, 2013 for the scheduled status conference. Defendant was still not represented by an attorney. Despite this, the judge proceeded without hesitation:

> THE COURT: We are here for [a] status conference today.
>
> The [S]tate's initial plea offers were for four years flat, New Jersey State Prison. [Prosecutor,] [h]as there been any counteroffer at this time[?]
>
> . . . .
>
> PROSECUTOR: There has not, Your Honor.
>
> THE COURT: [Defendant], you are here without an attorney. Are you going to represent yourself?
>
> DEFENDANT: Yes, I am, sir.
>
> THE COURT: Okay.

The judge asked defendant if he had discussed the case with the prosecutor. Defendant informed the court that he had provided discovery to the State in the "Sears case," referring to Indictment 13-01-208. The judge then asked defendant if he had "anything to give" the prosecutor with respect to Indictment 13-01-50. When defendant answered, "No," the judge admonished defendant that he had to provide the State with discovery before his next court appearance. When defendant said he had given the State all of the discovery he had concerning the "Sears" case and was "ready to go" to trial, the judge stated, "That's fine, but [the prosecutor] gets to choose which case he wants to move first." The judge concluded the hearing by scheduling a plea cut off conference under Rule 3:9-3(g).[5]

Through this exchange, the judge learned defendant was not aware that if he wanted to read the evidence the State presented to the grand jury, he had to order and pay for the transcript of the grand jury minutes. The judge did not ask defendant any questions about his financial status or whether he had made any other attempts to qualify for representation by the Public

---

[5] Under Rule 3:9-3(g) a "plea cut off" conference is held "[a]fter the pretrial conference has been conducted and a trial date set[.]" Thereafter, "the court shall not accept negotiated pleas absent the approval of the Criminal Presiding Judge based on a material change of circumstance, or the need to avoid a protracted trial or a manifest injustice."

Defender's Office. In short, the judge proceeded as if defendant's decision to waive his right to counsel was settled.

Three months later, defendant again appeared before the court without counsel. The judge advised defendant of his maximum sentencing exposure. The judge also explained the potential sentencing consequences that could result if defendant refused the State's plea offer of four years imprisonment for both open indictments. Defendant informed the judge that he wished to proceed to trial.

The judge then asked defendant the following questions regarding his decision to proceed without counsel:

> THE COURT: Have you ever consulted with an attorney on any of these things?
>
> DEFENDANT: Not . . . on the Sears [matter;] I've done basically all the research myself[.]
>
> . . . .
>
> THE COURT: Have you ever represented yourself in court before?
>
> DEFENDANT: Municipal.
>
> THE COURT: Do you understand that I cannot prohibit you from representing yourself pro se?
>
> DEFENDANT:  I understand that.
>
> THE COURT: But I'm not going to help you in the case either.
>
> DEFENDANT: I don't want you to.

A-2728-14T1

THE COURT: You're going to be governed by the rules of court.

DEFENDANT: Yes.

THE COURT: You're going to have to, when you cross-examine witnesses, ask questions [and] not make statements.

DEFENDANT: Correct.

THE COURT: If you choose to take the witness stand in your own defense, which you don't have to do, you can do that, and you will respond to the questions that I ask you by way of a narrative[.]

DEFENDANT: Mm-hmm.

THE COURT: And you also -- do you have a prior criminal record?

DEFENDANT: I have one felony.

THE COURT: That could be used against you in that situation where you take the witness stand.

. . . .

DEFENDANT: That's if I testify.

THE COURT: If you testify.

DEFENDANT: Yeah.

THE COURT: I will sanitize it, so that the only thing the jury will know is . . . either the indictment or accusation number, the date of the sentence, the sentence itself, . . . and the degree of the crime. I'm not going to get into the specifics with the jury of whatever crime you were convicted. But that will come up, because there was a charge that I can read to the

A-2728-14T1

jury about how that affects your credibility.

DEFENDANT: Sure.

THE COURT: Are you familiar with all of that?

DEFENDANT: Yes, I am.

THE COURT: Okay. And are you familiar with the rules of court? Have you done that research?

DEFENDANT: Not yet.

THE COURT: Have you -- are you familiar with the elements of the crimes [with] which you've been charged . . . ?

DEFENDANT: Yes, very familiar.

THE COURT: Okay. So, you're prepared on that?

DEFENDANT: Very. Very prepared.

THE COURT: And you still want to represent yourself?

DEFENDANT: Absolutely.

As the above excerpt demonstrates, the judge did not review the elements of the offenses on the record with defendant. Although the judge noted that he would "sanitize" under Sands[6]/Brunson[7] the information the jury would hear about his prior conviction if he elected to testify, the judge did not

---

[6] State v. Sands, 76 N.J. 127 (1978).
[7] State v. Brunson, 132 N.J. 377 (1993).

mention or discuss the State's intention to use this same evidence in its case-in-chief under N.J.R.E. 404(b).

As the conference continued, defendant asked the judge if he was permitted to speak with the State's witnesses and ask them questions before trial. The judge told defendant he had the right to investigate the charges against him, including speaking directly with potential witnesses. The judge warned defendant to be "very careful with what you say to them, because you don't want to in any way leave in their mind that you might be threatening them[.]" The judge failed to inform defendant that any self-incriminating statements he made to these witnesses could be used against him at trial under N.J.R.E. 803(b)(1).

At the end of this exchange, the judge made the following findings:

> THE COURT: He has chosen to go pro se. I am making a finding today that I have advised him against appearing pro se. I don't think it's smart. They say the person who . . . represents himself has a fool for an attorney. But under [State v. King], I can't force him to get an attorney. He is allowed to represent himself under the constitution . . . , and I'll permit that to happen, but I'm satisfied he understands the short-fallings of that and has decided to appear by himself.

Defendant then asked the judge whether he could have "a legal assistant" to answer his questions during trial.  The judge gave the following response:

> THE COURT: Just so you understand, --
>
> DEFENDANT: Right.
>
> THE COURT: -- they will not in any way take part in the proceedings, other than you can lean over and ask them certain questions.
>
> DEFENDANT: Correct.  Correct.  That's what I'm saying.
>
> . . . .
>
> THE COURT: But if you're going to represent yourself, you're going to represent yourself.  If I get the sense that this is actually your attorney just telling you everything to say, then I'm going to stop the proceedings and that person is going to represent you.
>
> . . . .
>
> THE COURT: But I will not discourage you. If somebody wants to come in pro bono and sit with you, or take less of a fee to sit with you, no, absolutely, you can do that.
>
> . . . .
>
> THE COURT: They just have to be a licensed attorney in the state of New Jersey.
>
> DEFENDANT:  No, he is.  He is.
>
> . . . .
>
> THE COURT: We are going to proceed [to trial] . . . regardless of whether he appears or not.

14

The judge scheduled the trial to start on December 2, 2013. Thereafter, the State filed the N.J.R.E. 404(b) motion seeking to introduce statements defendant made at his plea hearing on May 10, 2010. Defendant did not oppose the motion or appear for oral argument. In a certification submitted in support of his motion for a new trial, defendant averred he did not challenge the State's motion "because [he] did not understand it and had no legal counsel to help [him]." The court granted the motion and rescheduled the trial for June 3, 2014.

SECOND PUBLIC DFENDER APPLICATION

For reasons not disclosed in the record, defendant appeared before the trial judge on June 2, 2014, the day before the scheduled trial date. The judge noted that the charges against defendant had "been reduced to six counts because the prosecutor voluntarily dismissed several of the counts." In fact, the State dismissed fifty percent of the twelve charges originally listed under Indictment 12-01-208. The prosecutor characterized the State's decision to dismiss the charges as reflecting the true issue at stake: "not whether the checks were forgeries but whether the checks were bad[.]"

The judge addressed defendant one more time concerning his decision to proceed without counsel:

THE COURT: We had gone through Mr. Vanness'[s] desire to represent himself. As I recall, you do not qualify for the Office of the Public Defender, correct?

DEFENDANT: I might now, yeah.

In response to defendant's statement, the judge directed him to complete another 5A form and submit it to the Criminal Division Manager's Office.

A copy of the second 5A form is attached as an exhibit in the State's appendix.[8] Defendant self-appraised the value of his real property at $800,000, a reduction of $300,000 from the $1.1 million value he listed in the first 5A. The second 5A also showed the extent of defendant's liabilities. First, it demonstrated defendant owed $125,000 in total unpaid debts. Second, defendant averred his child support arrears had risen from $20,000 to $23,000. Finally, defendant attached notices from the Internal Revenue Service showing he owed $36,469.41 in unpaid federal taxes. The record does not reveal whether the Criminal Division Manager's Office questioned the authenticity of these documents.

---

[8] To document his ownership interest in the Neptune property, defendant attached a deed recorded on February 13, 2003, listing the name of a woman, purporting to be defendant's sister, granting defendant an ownership interest in the property as a joint tenant. Also attached is an Affidavit of Exemption from the payment realty transfer fees under N.J.S.A. 46:15-10(a). The affiants assert under oath that the transfer of ownership interest was "from sister to brother."

After the Criminal Division Manager reviewed defendant's second 5A application, the trial judge stated: "We again ran the criteria for qualifying for a public defender today. He still does not qualify for the public defender, [which is] why I will not assign a public defender as standby counsel." The record does not reveal the Criminal Division Manager's reasons for rejecting defendant's 5A. The trial judge did not make any further inquiries on the matter and again failed to inform defendant that "[a] determination to grant or deny the services of the Public Defender shall be subject to final review by the Assignment Judge or his [or her] designated judge." N.J.S.A. 2A:158A-15.1.

II

THE TRIAL

The trial began on June 3, 2014, and ended two days later. The State presented evidence showing that on April 30, 2009, Banco Popular Community Bank notified defendant in writing that it had closed his checking account. At the time, defendant's account at Banco Popular had a negative balance of $7,559.23.

In November 2012, Jean V. Sarno was employed as the loss prevention manager at the Sears store in Ocean Township, Monmouth County. She testified that at 3:30 p.m. on November 11, 2012, defendant purchased an air humidifier, a backup generator, and a gift card from the store. Defendant paid for these items with a check in the amount of $995.08, drawn on the same defunct Banco Popular checking account that had closed more than three years earlier.

Defendant returned to Sears twice on the following day and purchased additional merchandise from the same cashier. At 2:45 p.m., defendant purchased high thread-count sheets and two coffee makers for $957.55. At 3:39 p.m., defendant purchased more sheets, a television mount, and a third coffee maker for $930.80. Both times, defendant paid for the merchandise using checks drawn on his defunct Banco Popular checking account.

Sarno testified that Sears requires its cashiers to follow a particular procedure when a customer pays for merchandise with a check. This procedure requires cashiers to insert personal checks into a slot in the cash register, which verifies the check's validity by electronically contacting the customer's bank. When a customer pays for goods using a business check, the cashiers confirm the check's validity by calling an 800 number. Sears cashiers must also contact one of their

supervisors if a customer attempts to pay for goods with a check in excess of $500.

Shequelle Harris was the Sears cashier who processed defendant's purchases on November 11, 2012 and November 12, 2012. Sarno testified that Harris failed to follow the established anti-theft procedures when defendant made purchases on these two days. Specifically, she did not call the 800 number to verify the validity of defendant's business checks. Instead, Harris improperly processed all three of defendant's purchases as cash transactions and subsequently placed defendant's checks in her cash register drawer.

According to Daniel Schroeder, the manager of Sears's Ocean Township store at the time, defendant promptly returned all of the merchandise to other Sears locations in exchange for cash. A Sears office associate later discovered defendant's checks in Harris's cash register drawer. The associate alerted Sarno, who immediately reviewed the store's surveillance videos and confirmed Harris failed to adhere to the procedures established for processing check payments. Sarno testified that Banco Popular refused to honor any of defendant's checks. At this time, Sarno directed one of her "agents" to contact the Ocean Township Police Department. Ocean Township Patrol Officer

Michael DeSimone arrested defendant when he returned to the store on November 20, 2012.

At trial, the State called Absecon Police Sergeant Robert Ponzetti as a witness. Before Sergeant Ponzetti took the stand, the trial judge gave the following instructions to the jury:

> The State's next witness is going to introduce evidence that the defendant has previously given testimony under oath in a prior proceeding regarding his knowledge of the account at Banco Popular, . . . and his knowledge of whether checks written against that account would be honored.
>
> This testimony was given in the form of a statement under oath involving the writing of bad checks . . . arising from the defendant's writing and depositing of a check drawn against that same account back in September 2009.
>
> Normally such evidence is not permitted under our Rules of Evidence. Our rules specifically exclude evidence that a defendant has committed other crimes, wrongs, or acts when it is offered only to show that he has a disposition or tendency to do wrong[,] and[] therefore, must be guilty of the charged offenses that are before you.
>
> Before you can give any weight to this evidence, you must be satisfied that the defendant committed those other acts. If you are not so satisfied, you may not consider that evidence for any purpose. However, our rules do permit evidence of other crimes, wrongs, or acts when the evidence is used for certain specific narrow purposes.

A-2728-14T1

> In this case[,] the State is offering this evidence for the limited purpose of showing the defendant's knowledge that at the time of the writing of the prior check or checks against that account back [on] September 30, 2009, . . . the defendant knew that [the] checking account at Banco Popular[] . . . was closed, and that those checks written against that account at that time would not be honored by the bank.
>
> The bad check statute, under which the defendant is charged, requires the State to show that the defendant not only submitted a bad check, but also that he did so, quote, knowing that it would not be honored by the drawee, closed quote.
>
> This evidence is being presented to you for the limited purpose of assisting you in your determination as to whether the defendant knew at the time he allegedly wrote and presented the checks against this account on November 11 and 12, 2012 at Sears that these checks would not be honored by the bank they were drawn upon.

Sergeant Ponzetti read to the jury a section of a transcript of a plea hearing conducted on May 10, 2010, at which defendant admitted that on September 30, 2009, he passed "a check . . . made payable to Frank Vanness issued by John Vanness in the amount of $8,000[,] knowing that the TD Bank wouldn't honor that check." Defendant did not object.

Defendant called Shequelle Harris as a witness. Harris testified that when defendant paid for his Sears merchandise on November 11, 2012, he showed her his driver's license and asked her "four or five times" to hold the check and not deposit it.

Harris stated the check looked valid because the address listed on the check matched the address on defendant's driver's license. When defendant asked her when she would be working again, she told him she would be working the same cash register the next day.

Harris testified that defendant returned to Sears on November 12, 2012, and again purchased items at her cash register. Defendant gave her a business check to pay for his merchandise. Harris testified defendant again told her to refrain from depositing the check. According to Harris, defendant was "very persistent" about this request. She also stated that defendant did not ask for any type of receipt to document his purchases.

On cross-examination, Harris conceded she would not have accepted defendant's checks if she knew they were invalid. She admitted she did not follow Sears's procedures when she failed to process the checks electronically or call Banco Popular to verify their validity. Harris also admitted she was not authorized to accept and hold checks based on a customer's promise of future payment. On redirect, Harris claimed Sarno told her not to mention in her Sears incident report that defendant provided his driver's license or that he asked her to hold on to the checks. Harris alleged Sarno threatened that

she would be charged as defendant's accomplice and serve time in jail if she stated otherwise.

Defendant testified in his own defense. As soon as defendant took the witness stand, the trial judge addressed him, in the jury's presence, as follows:

> THE COURT: Mr. Vanness, have a seat. I am not going to act as your attorney and ask you questions. We know what the focus of this case is[;] . . . it's on the events of November 11 and November 12, 2012. <u>I will permit you to give a narrative of your version of what occurred</u>, and then the prosecutor will be allowed to cross-examine you. So you can proceed.
>
> DEFENDANT: How we doing --
>
> THE COURT: Don't talk to them[;] just give your version of what happened. You'll be able to talk to them in your summation.
>
> DEFENDANT: I guess I should start off by saying about probably 12 days I think after Sandy and it was my mom -- just one second.
>
> THE COURT: Why don't you just tell me what happened on November --
>
> DEFENDANT: I'm trying to --
>
> THE COURT: I don't need the backdrop of why --
>
> DEFENDANT: I want to explain the reason why I went to Sears.
>
> THE COURT: You went to Sears to purchase merchandise; is that correct?
>
> DEFENDANT: That's correct.

[(Emphasis added).]

This brief excerpt illustrates the approach the trial judge adopted during defendant's direct testimony. Despite the judge's initial promise that he would permit defendant to testify in "a narrative" format, the judge repeatedly interrupted and admonished defendant that he was not focusing on what happened on the day he went to Sears. The record shows the judge quickly abandoned his plan to allow defendant to tell the jury his "version" of events in a narrative fashion. Unable to keep defendant's "focus" on the material facts in the case, the judge assumed the role of de facto examiner. The following exchange illustrates this point:

> DEFENDANT: I decided at that time, I went in to Sears, I saw the generators, a small generator, picked that up and -- not so small, I think like 1500 watts it was or 25 -- I don't remember. And then there was a big air filter, and I said that would be good to use. And I went to check out, and that's when I -- Mrs. Harris was at the register.
>
> And knowing that I knew my checks were bad, I knew that I didn't want them deposited at all, and I didn't want them -- because I knew they would bounce[;] that's the reason why I asked her, please, hold on to the checks[;] do not deposit them.
>
> Being that I have a check charge in my life, I started to read up on it, and I knew exactly, thinking to myself, okay, I can't allow her to deposit these checks at all, and I have to make sure that she . . .

hold[s] them. I have to ask her to hold them. I knew that already.

So [I] rang up the items, and I was talking to her about Sandy and, you know, the things that happened to us, and, you know, my house was all messed up and my whole basement [was] flooded. I mean, everybody was a mess. I live in Shark River Hills right --

THE COURT: Again, you're not focusing on what happened that day.

DEFENDANT: Okay. Sorry.

At that point there when I talked to Miss Harris, I explained several times to her, please do not, do not, do not deposit my checks[;] please hold them. I will be back. That's basically -- besides all the in between talking of what was going on in the world, that's basically the transaction. She promised me that she wouldn't. She said that she would hold the checks. She would not deposit the checks.

THE COURT: Did you tell her that the checks were -- that there was no money in the account?

DEFENDANT: I did not tell her that. I did tell her that I would be back to pay for everything. That I did tell her.

I don't know if she -- I really don't know if she understood me or not but I did say four or five times, if not more, [p]lease do not deposit the checks[;] please hold them. And that was the truth.

THE COURT: So you left Sears with the items you purchased that day?

DEFENDANT: Correct. I did[.] . . . I did ask her when she was working again. I didn't know if my mother was going to be

able to get out and get the money so I decided, okay, go home, you know, hook up the generator, everything like that. We got an electric heater going, air filters, and we're good.

THE COURT: Did you go directly home?

DEFENDANT: Yes.

THE COURT: Then you hooked up the items?

DEFENDANT: Yes. Yes.

THE COURT: When is the next time you entered a Sears?

The judge continued to question defendant in this fashion until the end of his direct testimony. The jury found defendant guilty on all three counts of third degree theft by deception, N.J.S.A. 2C:20-4, and all three counts of fourth degree bad checks, N.J.S.A. 2C:21-5.

## III

## MOTION FOR A NEW TRIAL

On June 30, 2014, defendant appeared before the trial judge for arraignment in connection with unrelated charges under Monmouth County Indictment No. 13-01-50. At this time, the court had not yet sentenced defendant with regard to Indictment 13-01-208. Defendant again requested to be represented by the Office of the Public Defender. This time, Assistant Criminal Division Manager Kristi Smith reviewed and approved defendant's 5A application.

Defendant filed a motion for a new trial and requested to stay the imposition of sentence pending appeal. In a certification dated July 7, 2014, defendant averred the trial judge and Criminal Division Manager twice failed to appreciate his impecunious state and wrongly denied him his right to be represented by the Office of the Public Defender. Defendant also averred that the private law firm his mother hired to represent him on his motion for a new trial had agreed to accept "a substantially-reduced fee that my mother has promised to pay (I remain unable to pay any legal fees myself)."

Although not clearly stated, we presume the trial judge expected to hear argument on this motion at the day of sentencing. However, defendant failed to appear at the sentencing hearing. The judge stayed the hearing and issued a bench warrant for defendant's arrest. The case returned to the trial court on November 13, 2014, after defendant was apprehended on the bench warrant. By that time, defendant was represented by a "pool attorney"[9] assigned by the Monmouth County Public Defender's Office.

---

[9] The Office of the Public Defender is authorized to maintain and compensate "trial pools of lawyers" on a case-by-case basis. N.J.S.A. 2A:158A-7(c)—(d). Pool attorneys may be engaged "whenever needed to meet case load demands, or to provide independent counsel to multiple defendants whose interests may be in conflict." N.J.S.A. 2A:158A-9; see also N.J. Div. of Child

(continued)

Defense counsel argued defendant was entitled to a new trial under Rule 3:20-1 because the court had violated his Sixth Amendment right to counsel. In support of his argument, defense counsel described defendant's two unsuccessful attempts to qualify for representation by the Public Defender's Office. Counsel emphasized that defendant succeeded on his third attempt, despite the absence of any new information in his third 5A application. Counsel argued the Criminal Division Manager erred the first two times by misunderstanding that defendant owned his real property as a joint tenant with the right of survivorship.

Counsel noted that defendant's property was heavily leveraged and did not have any equity left to extract. Counsel also indicated that defendant produced proofs of personal debts and financial obligations to his minor children. Counsel argued this oversight was the product of an improper investigation by the staff responsible for determining when a person is indigent under N.J.S.A. 2A:158A-2. Counsel also argued the trial judge did not ensure that the vicinage's Assignment Judge, "or his [or her] designated judge," reviewed defendant's rejected 5A application, as provided in N.J.S.A. 2A:158A-15.1. Counsel

(continued)
Prot. & Permanency v. G.S., 447 N.J. Super. 539, 558 (App. Div. 2016).

stated the record shows that defendant did not knowingly waive his right to counsel. In fact, defendant doggedly sought an attorney to represent him from the date of arraignment through the start of trial. Defendant only represented himself when the judicial system, as represented by the trial judge and the Criminal Division Manager, left him with no other alternatives.

Independent of this error, defense counsel argued the trial judge failed to follow the standards that the Supreme Court established in King, supra, 210 N.J. 2, and improperly concluded defendant was capable of representing himself in this criminal jury trial. Although the judge acknowledged this court's decision in State v. Slattery, 239 N.J. Super. 534 (App. Div. 1990), he failed to follow the three "guidelines" a trial judge should consider when confronted with a defendant who does not qualify for the Public Defender, but has not retained private counsel. As part of these guidelines, we suggested: "If [the defendant] has not retained an attorney, stand-by counsel may be appointed with adequate provision for compensation." Id. at 550. The trial judge noted that he considered appointing stand-by counsel, but ultimately decided against it because defendant "was telling me he couldn't compensate anybody anything."

Defense counsel also argued the trial judge failed to timely and comprehensively examine defendant's background and

circumstances to ensure defendant both understood the perils of self-representation and knowingly and voluntarily waived his right to counsel. Defense counsel noted that in Slattery, we cautioned trial judges to conduct a "'searching and painstaking' inquiry . . . sufficiently in advance of the peremptory date set for the trial so as to enable the defendant to secure an attorney or decide to represent himself." Slattery, supra, 239 N.J. Super. at 550.

At the conclusion of oral argument, the trial judge denied defendant's motion for a new trial and sentenced defendant to serve a term of five years and pay the mandatory fines and penalties.

IV

Against this record, defendant raises the following arguments on appeal:

> POINT I: THE DEFENDANT'S MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED: THE DEFENDANT SHOULD HAVE BEEN GRANTED THE SERVICES OF THE PUBLIC DEFENDER.
>
> POINT II: DEFENDANT'S MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED: DEFENDANT DID NOT MAKE A KNOWING AND INTELLIGENT DECISION TO SELF-REPRESENT.
>
> POINT III: DEFENDANT'S MOTION FOR NEW TRIAL SHOULD HAVE BEEN GRANTED: THE COURT SHOULD HAVE GRANTED DEFENDANT'S REQUEST FOR THE ASSISTANCE OF STANDBY COUNSEL.

We are satisfied defendant was denied his right to counsel under the Sixth Amendment to the United States Constitution and Article I, paragraph 10 of the New Jersey Constitution. Under these circumstances, our only recourse is to reverse defendant's conviction and remand for a new trial. Although there are a number of factors that contributed to this outcome, the constitutional violation begins with the Criminal Division Manager's denial of defendant's application seeking representation by the Public Defender's Office. We will thus briefly summarize how this process should function.

The Legislature enacted the Public Defender Act (PDA), N.J.S.A. 2A:158A-1 to -25, "to provide for the realization of the constitutional guarantees of counsel in criminal cases for indigent defendants[.]" N.J.S.A. 2A:158A-1. As a matter of public policy, the Legislature declared that the "system and program established and authorized by this act [are dedicated] to the end that no innocent person shall be convicted, and that the guilty, when convicted, shall be convicted only after a fair trial according to the due process of the law." Ibid.

Although the Public Defender's Office is funded by the legislative branch and staffed by the executive branch, the judiciary is entrusted to "determine whether a defendant qualifies for a public defender[.]" In re Custodian of Records,

Criminal Div. Manager, 214 N.J. 147, 151 (2013). The then-existing Rule 3:4-2(b)(3) and the current Rule 3:4-2(c)(3) require the trial judge to inform a criminal defendant of his or her right to request a public defender at the first hearing before the court. In re Criminal Div. Manager, supra, 214 N.J. at 159; see also State v. A.L., 440 N.J. Super. 400, 404 (App. Div. 2015). If the defendant asserts indigence, the trial judge must instruct the defendant to complete a 5A application for a public defender. In re Criminal Div. Manager, supra, 214 N.J. at 159 (citing R. 3:4-2(b)(5)). As part of the application, the defendant provides employment and financial information on page three of the 5A form. Id. at 160. The defendant must certify the accuracy of the financial data he provides, and he must affirm his awareness that "willfully false" statements will subject him to punishment. Id. at 151, 160.[10]

Rule 3:8-3 charges each vicinage's Criminal Division Manager's Office with assessing public defender applications for indigency. If a defendant is found indigent, the Criminal Division Manager refers the defendant to the Office of the Public Defender no later than the date of his pre-arraignment

---

[10] Pursuant to Rule 1:4-4(b), a certification of this kind substitutes for an oath, and a person who submits a willfully false statement under a signed certification is subject to prosecution for false swearing. See State v. Feaster, 184 N.J. 235, 258 n.9 (2005) (citations omitted).

conference.  In re Criminal Div. Manager, supra, 214 N.J. at 160

n.2 (citing R. 3:8-3; R. 3:9-1(a)).

The PDA defines an "indigent defendant" as "a person who is

formally charged with the commission of an indictable offense,

and who does not have the present financial ability to secure

competent legal representation . . . and to provide all other

necessary expenses of representation."  N.J.S.A. 2A:158A-2.  In

determining whether a defendant qualifies as "indigent," the 5A

Office considers the factors set forth in N.J.S.A. 2A:158A-14:

> a. The financial ability of the defendant to engage and compensate competent private counsel;
>
> b. The current employment, salary and income of the defendant[,] including prospects for continued employment if admitted to bail;
>
> c. The liquid assets of the defendant, including all real and personal property and bank accounts;
>
> d. The ability of the defendant to make bail and the source of bail posted;
>
> e. Where appropriate[,] the willingness and ability of the defendant's immediate family, friends or employer to assist the defendant in meeting defense costs;
>
> f. Where appropriate[,] an assessment of the probable and reasonable costs of providing a private defense, based upon the status of the defendant, the nature and extent of the charges and the likely issues;
>
> g. Where appropriate, the ability of the defendant to demonstrate convincingly that

A-2728-14T1

he has consulted at least three private attorneys, none of whom would accept the case for a fee within his ability to pay; and

h. The ability of the defendant to provide all other necessary expenses of representation.

[N.J.S.A. 2A:158A-14.]

As the branch of government entrusted to determine who is eligible to be represented by the Office of the Public Defender:

The judiciary has an independent responsibility to [e]nsure that funds set aside for qualifying criminal defendants are not misappropriated by those who do not qualify but provide false information to obtain a public defender. See N.J.S.A. 2A:158A-15.1. For that reason, we refer the question of defendant's qualification for indigency status to the Assignment Judge for review. The Assignment Judge can rely on any relevant, competent evidence provided by any person or entity to determine whether defendant qualifies for a public defender.

[In re Criminal Div. Manager, supra, 214 N.J. at 152 (emphasis added).]

The Legislature also provided that if the court cannot accurately determine a defendant's eligibility for public defender services, or if an initial determination is found to be erroneous, the public defender must represent the defendant "on a provisional basis." A.L., supra, 440 N.J. Super. at 406 (citing N.J.S.A. 2A:158A-14). If the court subsequently determines the defendant was not eligible, the defendant is

required to reimburse the Office of the Public Defender "for the cost of the services rendered [up] to that time" and retain private counsel for his or her remaining needs. N.J.S.A. 2A:158A-14.

Here, the record shows defendant appeared at his arraignment without counsel. When defendant informed the judge that the Criminal Division Manager had denied his 5A application, the judge did not investigate the matter further.[11] The record shows the judge believed himself bound by the Criminal Division Manager's decision. This threshold error set the stage for how the judge proceeded from this point forward.

Although Rule 3:8-3 requires the Criminal Division Manager to review a defendant's 5A form to determine indigency under N.J.S.A. 2A:158A-14, the vicinage's Assignment Judge makes the ultimate determination of a defendant's indigent status. N.J.S.A. 2A:158A-15.1; In re Criminal Div. Manager, supra, 214 N.J. at 152. Here, the trial judge acknowledged he neither reviewed defendant's 5A form at any time, nor suggested that the vicinage's Assignment Judge evaluate defendant's indigency status.

---

[11] Rule 3:4-2(b) now authorizes the trial judge "to assign the Office of the Public Defender to represent the defendant for purposes of the first appearance."

The record strongly suggests defendant's financial status was not properly documented in the first 5A. This error could have been discovered, either at the arraignment or shortly thereafter, had the judge assigned counsel to represent defendant as <u>Rule</u> 3:4-2(b) now provides. Defendant's second 5A was supported by substantial documentary evidence. However, this application was also rejected without explanation. The Criminal Division Manager inexplicably approved defendant's third attempt to be represented by the Public Defender's Office, based on the same information he submitted with the second 5A form. By that time, a jury had convicted defendant on all of the six remaining charges in the indictment.

Pursuant to <u>Rule</u> 3:20-1, a defendant is entitled to a new trial when such is "required in the interest of justice." The decision of whether to grant or deny a motion for a new trial is left to the trial judge's sound discretion, and this court should interfere with the exercise of that discretion only when "a clear abuse has been shown." <u>State v. Brooks</u>, 366 <u>N.J. Super.</u> 447, 454 (App. Div. 2004) (quoting <u>State v. Russo</u>, 333 <u>N.J. Super.</u> 119, 137 (2000)). Appellate review is limited to a determination of whether the trial court could reasonably have reached the findings it made based on "sufficient credible evidence . . . in the record." <u>Ibid.</u> (quoting <u>Russo</u>, <u>supra</u>, 333

N.J. Super. at 137).  Moreover, this court owes deference to the trial judge's "feel for the case" because he or she had the opportunity to "observe and hear the witnesses as they testified."  Ibid. (quoting Russo, supra, 333 N.J. Super. at 137).

At the hearing on defendant's motion for a new trial, defense counsel emphasized the incongruity in the Criminal Division Manager's decision.  Although the trial judge believed the decision to approve the 5A was based on supplemental information, this proved to be incorrect. Ultimately, the judge was unable to reconcile the Criminal Division Manager's position with the uncontested, salient facts.  Despite this, the judge denied defendant's motion for a new trial, finding defendant had not been prejudiced by the denial of counsel.  On this record, we are satisfied defendant is entitled to a new trial under Rule 3:20-1.

We hold the trial court violated defendant's constitutional right to counsel at every critical stage of the criminal process.  See State v. Scoles, 214 N.J. 236, 258 (2013) (citation omitted) (quotation marks omitted).  This constitutional violation tainted the entirety of the proceedings.  On this basis alone, there is more than sufficient

grounds to conclude the trial court erred in denying defendant's motion for a new trial under Rule 3:20-1.

The judiciary's responsibilities to determine a criminal defendant's eligibility for taxpayer-funded representation are not merely ministerial. Criminal trial judges are uniquely positioned to monitor how our commitment to the right to counsel is honored on a daily basis. No system is perfect. When the Criminal Division Manager denies a defendant's 5A application based on an insufficient basis to establish indigency, the trial judge should assign temporary counsel, as Rule 3:4-2(b) now provides, and inform the defendant of his or her right to have the application reviewed by the Assignment Judge or a judge designated under N.J.S.A. 2A:158A-15.1. No denial of a 5A application is final until the Assignment Judge or "his designated judge" makes a final decision. Ibid.

Our State's commitment to preventing poverty from undermining the right to counsel in criminal trials has deep roots. See State ex rel. P.M.P., 200 N.J. 166, 174 (2009) (citing State v. Sanchez, 129 N.J. 261, 274—75 (1992)) ("New Jersey has provided counsel for indigent defendants since 1795."). Indeed, "[h]istorically, the guarantee of the right to counsel in the New Jersey Constitution antedates the adoption of the Sixth Amendment." Sanchez, supra, 129 N.J. at 274. This

38

case marks a regrettable deviation from this honorable tradition. This case illustrates how a series of systemic failures circumvented the failsafe protocols established by the Legislature and the Supreme Court to ensure that impecuniosity will never deprive a person facing criminal prosecution of the right to be represented by competent counsel at every critical stage of the proceedings.

V

The record shows the trial judge believed the Supreme Court's decision in King, supra, 210 N.J. 2, required him to grant defendant's decision to represent himself. In the judge's own words: "A new case came down that said I can't stop somebody from representing themselves even if it's a bad idea for them." We conclude the judge misunderstood the Court's holding in King. A brief review of the facts in King is necessary to give this discussion context. Defendant Marcus King was indicted on three counts of first degree robbery, N.J.S.A. 2C:15-1. King, supra, 210 N.J. at 8. He was represented by an attorney up to the day of trial. See id. at 10. On the day of trial, "shortly before the trial was scheduled to begin[,]" King appeared with his attorney who informed the trial judge that his client wanted to represent himself. Ibid.

Despite King's clear and lucid acknowledgment of the perils of self-representation, and his unequivocal desire to proceed without an attorney, the trial judge refused to honor his waiver of the right to counsel. Id. at 14. As the Supreme Court noted:

> After listening to [the] defendant's responses to the various questions posed to him, the trial court proceeded to rule on the application. The trial court stated that it was not "satisfied" that defendant "fully under[stood] the nature and consequences of this decision." It pointed to the fact that defendant was unable to state what he had written down while doing research in the law library a few days ago and could not adequately answer the court's questions about the court rules or the evidence rules. The court found that defendant's "inability to do that" precluded an intelligent waiver of his right to counsel.
>
> [Ibid.]

Relying on long-established precedent from the United States Supreme Court, our Supreme Court reaffirmed that "[t]he right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage." Id. at 17 (quoting Faretta v. Cal., 422 U.S. 806, 834, 95 S. Ct. 2525, 2540—41, 45 L. Ed. 2d 562, 581 (1975)). It is clear to us that the key underlying principle at

stake in King was the right of self-determination. In our view, the Court in King admonished judges to guard against paternalistic tendencies that usurp an adult defendant's right to choose his or her own path, and to honor a defendant's right to make an informed and intelligent decision to waive a constitutional right, even if that decision may be fraught with latent perils and ultimately proven to be unwise. King, supra, 210 N.J. at 21.

Here, the record does not indicate defendant ever sought to waive his constitutional right to counsel. Defendant's repeated attempts to qualify for representation by the Public Defender's Office were indisputable proof that he wanted legal representation. This case represents the polar opposite of King. Here, the judge was not overly protective. Here, the judge failed to take the measures required under both the PDA and the United States and New Jersey Constitutions to ensure defendant's right to counsel was not denied by administrative oversight.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2728-14T1