40 A.3d 41

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. MARCUS KING, DEFENDANT–APPELLANT.

Argued January 4, 2012—Decided April 12, 2012.

4

*Frank J. Pugliese,* Assistant Deputy Public Defender, argued the cause for appellant (*Joseph E. Krakora,* Public Defender, attorney).

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for respondent (*Jeffrey S. Chiesa,* Acting Attorney General of New Jersey, attorney).

Judge WEFING (temporarily assigned) delivered the opinion of the Court.

A jury convicted defendant of three counts of first-degree robbery, *N.J.S.A.* 2C:15–1. The trial court sentenced defendant to an aggregate term of thirty-five years in prison, subject to the parole ineligibility provisions of *N.J.S.A.* 2C:43–7.2. The Appellate Division affirmed defendant's convictions and sentence in an unpublished opinion. We granted certification to consider defendant's contention that the trial court improperly denied him the right to self-representation. Because our review of this record and the arguments presented by the parties convince us that defendant is correct, we reverse his convictions and remand this matter to the trial court for further proceedings.

## I.

In the early morning hours of September 25, 2002, three armed men entered a Howard Johnson hotel in North Plainfield. They assaulted the clerk who was on duty and demanded he hand over the hotel's money. When the clerk was unable to comply with their demands for access to the hotel's safe, they took the several hundred dollars in cash that was in the register and left. Approximately an hour later, three armed men entered another hotel in Bridgewater; two entered the lobby and the third proceeded to the restaurant/kitchen area. The two intruders in the lobby went to the desk clerk, and one, brandishing a knife, demanded money. The second intruder kicked the clerk and ordered him to take the men to the hotel safe and open it. As with the first hotel, the clerk surrendered the money he had but was unable to open the safe. While the first two intruders were occupied with the clerk, the third intruder held a guest at gun-point in the hotel's restaurant/kitchen area and rifled through her pockets. After their efforts to obtain access to the hotel's safe again proved fruitless, the three intruders departed. In both robberies, the robbers covered their faces and none of the victims were able to identify the perpetrators.

Defendant, together with another man, Khaleel Butts, was apprehended a week later, following a third unrelated robbery. Both Butts and defendant confessed to their involvement with the two hotel robberies and identified Saheed Nurideen as the other participant. In October 2002, together with his two cohorts, defendant was indicted for three counts of first-degree robbery, one for each of the hotel clerks and one for the guest. Defendant originally entered a negotiated plea of guilty, under which he agreed to testify against Nurideen. When he later refused to testify, his guilty plea was vacated and the matter was scheduled for trial.[1]

---

[1] Butts also pled guilty and agreed to testify at trial. When he appeared, he maintained that he was unable to remember any of the events. Butts was shown his prior statement, but it did not refresh his recollection.

Defendant, accompanied by his attorney, appeared before the trial court shortly before the trial was scheduled to begin. His attorney informed the trial court that he had had several discussions with defendant and that defendant had informed counsel that he wished to represent himself at his trial. Defense counsel told the court that defendant's request was not unexpected, as defendant had been contemplating the issue for some time. The attorney provided the trial court with some background information with respect to defendant, noting that defendant was literate and, while he had not graduated from high school, he had completed the tenth grade. He also said that defendant had participated in two trials already and understood the judicial process.

When the prosecutor did not interpose any objection to the informal manner in which the issue was presented, the trial court proceeded to deal with the substance of the request. In response to the trial court's question, defendant told the court that he had recently been tried in Monmouth County on a similar charge and had sat through all the proceedings, including various motions that had been argued. Defendant told the trial court that he had been convicted at that trial, which resulted in the imposition of an extended sentence. The trial court then questioned defendant with respect to his knowledge of particular areas, asking, for example, if defendant knew what a statute is (defendant was unable to give an accurate response); if he knew the statutory penalties for first-degree robbery (defendant did not); and if he was familiar with the rules of evidence (defendant said he had them copied down but "couldn't tell you them offhand").

Defendant explained he had done some reading at the law library to prepare for trial. The trial court asked what books he had read, and defendant responded that he had read a book on trial procedure; he could not recall the author but said he had the name "written down." The colloquy continued as follows:

Q. What defenses do you have?

A. Say that again, sir.

Q. Do you have any defenses?

A. No, sir.

Q. Did you look it up in any of the books to determine what kind of defenses are available to a person charged with robbery?

A. No, sir, I wasn't focused on that.

Q. Well, how are you going to defend yourself if you don't know what defenses might be available to you?

A. Because the only thing I was paying attention to was the statements I was given, the strategies I could use when I get my turn to approach the witnesses. Stuff like that. I wasn't focused on all that other stuff. I was just focused on my cross-examine.

Q. Do you think it would be helpful to you to know—have some idea what defenses might be available to a person under the penal code who is charged with robbery?

A. Yes, sir.

Q. But you didn't look those defenses up?

A. Right now I am in the process—while I am at the County Jail I am looking all that up. I had all that written down. But I wasn't aware that I was being brought to court, so I wasn't able to bring my paperwork with me.

. . . .

Q. So are you telling me that, as you stand here today, you have no idea what the defenses to robbery might be?

A. No, sir, I don't.

Q. Well, do you think you might have some difficulty in trying this case if you don't even have an idea what your defenses might be?

A. No, sir.

Q. Huh?

A. No, sir.

Q. No?

A. No.

Q. Well, isn't that like saying I can fly a plane but I don't know what the instruments are on the instrument panel?

A. I know I am willing to go to trial with what I have, sir. With my own defense.

Q. I don't understand.

A. I am willing to go to trial with what I have prepared for myself. I can't explain it. I can't sit and explain it to you in legal terms. But I know in my terms what I am ready to do.

Q. But you have got to understand something, Mr. King. I have got to make a determination that you are in fact capable of understanding what is going on.

A. I understand fully what is going on.

The trial court indicated some unease at defendant's ability to make an informed, intelligent decision on the question of whether

to represent himself at trial. It assured defendant that his attorney was a very experienced criminal trial lawyer. Defendant responded that his decision had nothing to do with that particular attorney, which prompted the trial court to ask defendant about the reasons for his decision.

Q. Tell me what it has to do with.

A. My last trial [I] went through I also had a very good experienced lawyer and I still lost and during that trial I sat there and there were certain things I wanted to ask the witness that I wasn't able to ask and my lawyer felt it wasn't appropriate to ask or he feel that it would have hurt me while I felt it would help me.

So, therefore, if I am going to lose another trial, I'd rather lose it by myself then [sic] in somebody else's hands.

Later, the colloquy resumed.

Q. .... Now you are asking me to let you go to trial and you don't have any idea what defenses might be available to you.

A. No, I don't. But I know how I am going to present my case. I know how I am going to represent myself.

Q. How are you going to do it? Tell me what you are going to do?

A. I would rather not get into that right now, sir. Then the Prosecutor is going to know what I am going to do.

Q. So you don't want to tell me about it because you think it is trial strategy. Is that right?

A. Yes, sir.

....

Q. Have you had discussions with [defense counsel] about doing this?

A. No.

Q. Do you think it would have been helpful to sit down and talk to an experienced lawyer about the difficulties you may have in representing yourself?

A. It may. But I just felt I didn't want to do it.

Q. You what?

A. I didn't want to do it.

Q. You didn't want to talk to a lawyer about it?

A. No.

Q. Any lawyer?

A. No.

In response to further questions, defendant indicated he was not familiar with the term "lesser included" and admitted he did not know what the court rules were. But he said that he was familiar with what a jury charge should encompass. Defendant also said

he wanted his present attorney to act as standby counsel, a position that was satisfactory to defense counsel.

After the prosecutor and defense counsel had the opportunity to ask several questions of defendant, the trial court again tried to determine the extent to which defendant was prepared to represent himself at trial.

Q. Would you agree with me, Mr. King, that you may have some difficulty because you don't know the defenses that you might have? That would cause a problem, wouldn't it?

A. I know I am going to have difficulties. But that's, again, why I have my co-counsel whenever I need help.

Q. No. I understand that you are going to have co-counsel. But what I am asking you is whether or not you would agree with me that the fact that you do not even know, as you stand here today, what defenses you might have to a robbery charge, could cause you some problems during the trial?

A. It could. But like I said, I don't know it offhand, but I don't have the information written down [with me].

Q. Where is it written down?

A. It is in my cell.

Q. Where did you get it?

A. From at the law library, Somerset County Jail.

Q. So you tell me you went to the law library in the Somerset County Jail and you wrote down defenses to robbery but you don't remember any one of them?

A. No, sir.

Q. How long ago did you do this?

A. About two or three days ago.

Q. So this is only recently that you started to get ready, is that right?

A. Yes, sir.

Q. Okay.

A. I have been having this information written down, down at Trenton State Prison. But as I say, I wasn't aware that I was being brung here, so I didn't— when you are being transported to go to court down there, they don't tell you when you are going to court. So I wasn't able to bring none of my paperwork with me.

Q. Now, would you agree with me that since you don't know what the Rules of Evidence are, that could be a problem for you during the trial?

A. I don't think it is going to be a problem because I have that information written down right in front of me on a piece of paper. When that time comes, I will be able to go over everything before I get up to open my mouth.

Q. Well, where did you write these things down from?

A. From Somerset County Jail.

Q. How many pieces of paper do you have?

A. About a notebook and a half.

Q. Would you be surprised if I held up a book and held up a book and showed you the book and said this [is] the Rules of Evidence?

A. No, I wouldn't be surprised. I know how thick they are.

Q. Well you tell me you wrote all these down?

A. I am not saying I wrote all them down. I conferred with the law library legal aid and he gave me certain defenses that will probably be good for my defense. And those are the things that I focused on. Those are the things that I copied down.

Q. And you only did this when?

A. Say that again.

Q. When did you do this?

A. This occurred about two or three days ago.

Q. Tell me one thing you wrote down.

A. I couldn't tell you that offhand, sir.

Q. You can't remember anything that you wrote down two or three days ago?

A. Because I was focused on more than just that. That just wasn't my only focus.

Q. What else were you focused on?

A. Going over the statements that witnesses made.

Q. Do you recognize and acknowledge that you are going to be functioning as an attorney representing yourself as an accused party in a criminal case that could cause you some problem?

A. Yes, sir.

Q. You agree with that?

A. Yes, and I am willing to face those problems.

After listening to defendant's responses to the various questions posed to him, the trial court proceeded to rule on the application. The trial court stated that it was not "satisfied" that defendant "fully under[stood] the nature and consequences of this decision." It pointed to the fact that defendant was unable to state what he had written down while doing research in the law library a few days ago and could not adequately answer the court's questions about the court rules or the evidence rules. The court found that defendant's "inability to do that" precluded an intelligent waiver of his right to counsel. Accordingly, the trial court denied defendant's application and directed that the trial proceed with defense counsel representing defendant.

Defendant was tried with his co-defendant, Saheed Nurideen, who had earlier been granted permission to represent himself with the assistance of standby counsel. The jury found defendant guilty on all accounts but was unable to reach a decision with respect to Mr. Nurideen, resulting in a mistrial with respect to him. The trial court sentenced defendant to an aggregate term of thirty-five years in prison, subject to the parole ineligibility provisions of *N.J.S.A.* 2C:43–7.2.

Before the Appellate Division, defendant contended that the court's ruling violated his right to self-representation. He also argued that the trial court's charge to the jury was defective and that his sentence was excessive. The Appellate Division was not persuaded by those assertions, and affirmed defendant's convictions and sentence. He petitioned this Court for certification, and we granted the petition. *State v. King,* 206 *N.J.* 64, 64, 17 *A.*3d 1245 (2011).

## II.

Before this Court, defendant again contends that the trial court, when it denied his motion to proceed pro se, violated his right to self-representation. He argues that the focus of the trial court's analysis was misdirected because it concentrated on defendant's legal knowledge and ability to represent himself, rather than on defendant's awareness and appreciation of the inherent dangers and disadvantages a defendant faces when proceeding pro se. Defendant points to what he deems to be several deficiencies in the trial court's questioning of defendant and its apparent emphasis on the trial court's view that the decision to proceed pro se was a poor one that would redound to defendant's detriment. Defendant asserts that the Appellate Division, which found no abuse of discretion in how the trial court handled the issue, did not apply correctly the governing legal principles.

Defendant further argues that the failure of the trial court to instruct the jury with respect to accomplice liability was unduly

prejudicial to him. And, as he did before the Appellate Division, he maintains that his sentence is manifestly excessive.

The State counters defendant's argument with respect to the trial court's denial of his motion to proceed pro se by asserting that the trial court was properly concerned with whether defendant was fully aware of the magnitude of the task he was seeking to undertake. It describes the trial court's several colloquies with defendant as a "penetrating examination" in which the trial court sought to assess whether defendant was acting knowingly, intelligently and voluntarily. Further, the State challenges the credibility of defendant's answers to several of the trial court's questions. It describes defendant's responses as lacking in candor and points to that perceived deficiency as a further ground for the trial court's decision to deny defendant's application. The State asserts that certain of defendant's actions during the subsequent trial demonstrate the validity of the trial court's concerns. It also notes the late nature of defendant's application and stresses that defendants cannot be permitted to interject untimely applications and interfere with the court's ability to control its calendar.

### III.

Before proceeding to a detailed analysis of defendant's contentions in the light of the record created in the trial court, we note the fundamental principles that must guide our consideration of the arguments the parties present to us. Both the United States Constitution and our New Jersey Constitution grant defendants charged with a criminal offense the right to have the assistance of counsel. *U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10. The corollary to the right of a criminal defendant to be represented by an attorney is the defendant's right to represent himself. *Faretta v. California,* 422 *U.S.* 806, 814, 95 *S.Ct.* 2525, 2530, 45 *L.Ed.*2d 562, 570 (1975). In *Faretta,* Justice Stewart, writing for the Court, traced the historical development of the right to counsel, placing it alongside "[t]he right of self-representation." *Id.* at 818, 95 *S.Ct.* at 2532, 45 *L.Ed.*2d at 572. He found

"support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged." *Ibid.* Justice Stewart cited a number of historical precedents to support the Court's conclusions. *Ibid.* It cannot escape our notice that among those precedents, he included the 1677 Concessions and Agreements of West Jersey, which provided "that no person or persons shall be compelled to fee any attorney or councillor to plead his cause, but that all persons have free liberty to plead his own cause, if he please." *Id.* at 828 n.37, 95 *S.Ct.* at 2538 n.37, 45 *L.Ed.*2d at 578 n.37 (internal quotations omitted).

The Court in *Faretta* recognized that a defendant's decision to proceed pro se may be fraught with risk but that the existence of such risk provides no basis to deny a defendant the right to make that choice. *Id.* at 834, 95 *S.Ct.* at 2540–41, 45 *L.Ed.*2d at 581.

> To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law."
>
> [*Ibid.* (quoting *Illinois v. Allen*, 397 *U.S.* 337, 350–51, 90 *S.Ct.* 1057, 1064, 25 *L.Ed.*2d 353, 363 (1970)).]

Several years after *Faretta*, the Court in *McKaskle v. Wiggins*, 465 *U.S.* 168, 104 *S.Ct.* 944, 79 *L.Ed.*2d 122 (1984), described the rationale behind its recognition of a defendant's right to appear pro se. "The right to appear pro se exists to affirm the dignity and autonomy of the accused . . . ." *Id.* at 176–77, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132 (alteration in original). Then–Justice Zazzali expressed the same view in *State v. Reddish*, 181 *N.J.* 553, 859 *A.*2d 1173 (2004), for this Court: "*Faretta*, ultimately, is about respecting a defendant's capacity to make choices for himself, whether to his benefit or to his detriment."

*Id.* at 585–86, 859 *A.*2d 1173. Indeed, a defendant's right to represent himself in criminal proceedings is so fundamental that it encompasses both the guilt and the penalty phases of capital proceedings. *Id.* at 579, 859 *A.*2d 1173.

A defendant's right of self-representation is not absolute, however, and it cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts. *State v. McNeil,* 405 *N.J.Super.* 39, 51, 963 *A.*2d 358 (App.Div.2009). Thus, a trial court has the duty to assure that a defendant's waiver of counsel is made "knowingly and intelligently." *State v. Crisafi,* 128 *N.J.* 499, 509, 608 *A.*2d 317 (1992). In *Crisafi,* the Court outlined the topics a trial court must explore with a defendant. To fulfill this duty, a trial court must inform a defendant of the charges to be tried, the statutory defenses to those charges, and the potential sentencing exposure that accompanies those charges. *Id.* at 511, 608 *A.*2d 317. A court should also inform a defendant of the risks he faces and problems he may encounter. *Id.* at 511–12, 608 *A.*2d 317. In addition, the court should explain that a defendant representing himself remains as obligated to follow the applicable rules of procedure and evidence as would a licensed attorney. *Id.* at 512, 608 *A.*2d 317. Further, a court should stress the difficulties inherent in proceeding without an attorney and "specifically advise the defendants that it would be unwise not to accept the assistance of counsel." *Ibid.*

In *Reddish, supra,* the Court expanded the subjects to be covered.

> By way of illustration, those additional areas would include whether defendant will experience difficulty in separating his roles as defendant and counsel; whether defendant understands that he not only has the right not to testify, but also the right not to incriminate himself in any manner; whether he understands that he could make comments as counsel from which the jury might infer that he had knowledge of incriminating evidence (and the difficulty in avoiding such comments); and whether he fully understands that if he crosses the line separating counsel from witness, he may forfeit his right to remain silent and subject himself to cross-examination by the State.
>
> [*Reddish, supra,* 181 *N.J.* at 594, 859 *A.*2d 1173.]

A trial court must also ensure that a defendant seeking to represent himself at trial is aware that in the event of a conviction, he will not be able to seek post-conviction relief alleging he had been deprived of the effective assistance of counsel. *Ibid.* A trial court should, as a general rule, cover those considerations with the defendant in one proceeding. *State v. DuBois,* 189 *N.J.* 454, 469, 916 *A.*2d 450 (2007).

When a trial court is presented with a defendant who seeks to proceed pro se, and engages that defendant in such a colloquy, its goal is not to explore a defendant's familiarity with " 'technical legal knowledge[,]' " for that is not required. *Reddish, supra,* 181 *N.J.* at 595, 859 *A.*2d 1173 (quoting *Faretta, supra,* 422 *U.S.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581–82). Rather, "the trial court must question defendant to ascertain whether he actually understands the nature and consequences of his waiver." *Id.* at 594, 859 *A.*2d 1173 (citations omitted).

When the trial court analyzes a defendant's responses to its examination, it should " 'indulge [in] every reasonable presumption against waiver.' " *State v. Gallagher,* 274 *N.J.Super.* 285, 295, 644 *A.*2d 103 (App.Div.1994) (quoting *State v. Guerin,* 208 *N.J.Super.* 527, 533, 506 *A.*2d 743 (App.Div.1986)) (alteration in original). Further, it should consider the particular nature of the waiver being sought-whether the defendant "seek[s] to exercise the right to self-representation in whole," *State v. Figueroa,* 186 *N.J.* 589, 593, 897 *A.*2d 1050 (2006), and handle his defense entirely by himself; or does the defendant seek to exercise it in part and handle only portions of the trial, *id.* at 594, 897 *A.*2d 1050; or does the defendant seek to handle the trial but with the assistance of standby counsel. *See ibid.* It is the latter situation that is presented in this appeal.[2]

---

[2] In the colloquy we set forth earlier, both defendant and the trial court referred to defendant's attorney serving as co-counsel. We infer from the context that this was an inadvertent error, as defense counsel would have served

■ Only in the rare case can the record support a finding that, in the absence of such a searching examination, a defendant did indeed "fully appreciate[ ] the risks of proceeding without counsel, and ... decide[ ] to proceed pro se with his eyes open." *Crisafi, supra,* 128 *N.J.* at 513, 608 *A.*2d 317 (noting that defendant, "a court-wise criminal ... [with] extensive experience with the criminal justice system,"· made knowing and intelligent decision to proceed pro se).

## IV.

■ With those principles to guide us, we turn to the colloquy in this matter and the trial court's ultimate denial of defendant's request to proceed pro se. We have concluded that the trial court's examination was insufficient and, as a result, its ultimate determination was flawed. We note that the deficiencies in the manner in which the trial court handled defendant's application are undoubtedly due, in some measure, to the way in which defendant presented the issue. Despite the fact that both defendant and his attorney told the court that he had been considering the topic for some time, defendant submitted no papers in advance to alert the trial court that he intended to raise the issue. He presented no legal memorandum outlining why, in his view, the law called for his request to be granted. The trial court was confronted with a complex legal issue on the eve of the scheduled trial date with no meaningful opportunity to prepare. The better course would have been for the trial court to declare a short recess to review which issues should be addressed and how. Such an approach could have prevented the reversal that we consider necessary.

■ Whether defendant could define the term "statute" or was familiar with the term "lesser included" was essentially immaterial to the issue before the trial court. Nor was it particularly

---

as standby counsel. In light of our conclusion that defendant's convictions must be reversed, the matter should be clarified on remand.

significant that defendant said he could not recall the name of the author of the book on trial procedure that he had read. Such questions go to whether defendant had technical legal knowledge, not whether he comprehended the risks and consequences of acting as his own attorney.

Defendant was well aware of the nature of trials. He noted that he had recently participated in a trial in another county and, as he succinctly put it, if he were to lose again, "I'd rather lose it by myself [than] in somebody else's hands." He demonstrated his awareness of the importance of trial strategy, moreover, by refusing to tell the trial court how he intended to represent himself lest the prosecutor would know in advance what he planned to do.

The trial court was concerned understandably about defendant's ability to present a sound defense. Such concern, no matter how well-intentioned, cannot override defendant's exercise of his right to decide to represent himself. Nothing within the colloquy indicated that defendant lacked the competency to make that choice. This matter is thus completely distinguishable from that presented in *McNeil, supra,* 405 *N.J.Super.* 39, 963 *A.*2d 358, in which the Appellate Division upheld the action of the trial court in not permitting a mentally-ill defendant from proceeding pro se. *Id.* at 52–53, 963 *A.*2d 358.

Nor are we persuaded by the State's reference to defendant's behavior during the subsequent trial as a justification for the trial court's ruling. We have no way of knowing the motivation for that behavior. It may have flowed from defendant's view that the trial court denied his motion because, in the words of Justice Stewart, "the law contrives against him." *Faretta, supra,* 422 *U.S.* at 834, 95 *S.Ct.* at 2540, 45 *L.Ed.*2d at 581. It is also plausible that his behavior may have sprung from his relationship with his co-defendant. Certainly nothing within the pretrial colloquy contained the least hint or concern that defendant would behave in a disruptive, obstreperous manner.

 Because we are satisfied that the record created in response to defendant's motion does not support the denial of his right to represent himself, his convictions must be reversed. "The right [of self-representation] is either respected or denied; its deprivation cannot be harmless." *McKaskle, supra,* 465 *U.S.* at 177 n.8, 104 *S.Ct.* at 950 n.8, 79 *L.Ed.*2d at 133 n.8. Defendant may have been represented by a skilled attorney, the evidence against him may have been substantial, and the verdict may find strong support in the record; that matters not. *See State v. Thomas,* 362 *N.J.Super.* 229, 244, 827 *A.*2d 1087 (App.Div.2003). The trial court failed to honor defendant's right to make this decision. We have the obligation to recognize and vindicate that constitutional right. *Figueroa, supra,* 186 *N.J.* at 596–97, 897 *A.*2d 1050. Because defendant must be retried, we do not discuss defendant's remaining two contentions.

 We note for the sake of completeness that defendant's attorney at oral argument contended that it was improper for the trial court during the course of the proceedings, with respect to defendant's request to proceed pro se, to permit the prosecutor to question defendant directly. Defendant made no objection at the time this occurred and did not raise his argument before the Appellate Division. Indeed, prior to oral argument, defendant's only reference to this issue is in a footnote to his supplemental brief to this Court. Additional legal issues may not be raised by footnotes in a brief. *Almog v. Israel Travel Advisory Serv., Inc.,* 298 *N.J.Super.* 145, 155, 689 *A.*2d 158 (App.Div.1997). We thus decline to address the question substantively but would only note for future guidance that permitting such direct questioning is fraught with unnecessary risks.

## V.

Defendant's convictions are reversed, and the matter is remanded to the trial court for further proceedings in accordance with this opinion.

*For reversal and remandment*—Chief Justice RABNER, Justices LaVECCHIA, ALBIN, HOENS, PATTERSON and WEFING (temporarily assigned)—6.

*Opposed*—None.