# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1318-16T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

K.M.B.,

     Defendant-Appellant.

_____

Submitted January 21, 2020 – Decided April 23, 2020

Before Judges Sabatino and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 11-01-0072.

Joseph E. Krakora, Public Defender, attorney for appellant (Michele E. Friedman, Assistant Deputy Public Defender, of counsel and on the briefs).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the brief; Catherine A. Foddai, Legal Assistant, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant appeals his September 30, 2016 convictions and sentences for first-degree aggravated sexual assault through the digital penetration of a child less than thirteen years old, N.J.S.A. 2C:14-2(a)(1), and third-degree endangering the welfare of a child through sexual conduct impairing or debauching the morals of the child, N.J.S.A. 2C:24-4(a). For the aggravated sexual assault conviction he was sentenced to a sixteen-year prison term subject to an eighty-five percent parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, to run concurrently with a four-year prison term for endangering the welfare of a child.

For the reasons that follow, we affirm the convictions. However, as the State concedes, we remand for correction of a fourth amended judgment of conviction (JOC) to reflect defendant's sixteen-year aggravated sexual assault sentence is not subject to NERA, which was not in effect at the time the offense was committed, but rather it is subject to an eight-year parole disqualifier.

I.

First Trial

Defendant was indicted on January 13, 2011 for first-degree aggravated sexual assault and second-degree endangering the welfare of a child through

sexual conduct impairing or debauching the morals of the child by someone with a legal duty of care or assumed responsibility of care, N.J.S.A. 2C:24-4(a). The latter charge was amended to third-degree endangering the welfare of a child through sexual conduct impairing or debauching the morals of the child. The victim, Katie,[1] is the daughter of defendant's former girlfriend.

In 2011, a jury found defendant guilty of the charges and he was sentenced to an aggregate prison term of sixteen years with an eight-year period of parole ineligibility. We reversed his convictions on direct appeal because the trial court denied defendant's constitutional right to represent himself and remanded the matter for further proceedings. State v. K.M.B., No. A-5387-11 (App. Div. Dec. 17, 2014) (slip op. at 9-10).

Second Trial and Pretrial Proceedings

On September 28, 2105, following remand, defendant indicated to a different trial court that he wished to be represented by the Office of the Public Defender (OPD). An attorney ("OPD counsel") from the OPD was assigned to

---

[1] We use pseudonyms to protect the privacy of the child victim and members of the family. R. 1:38-3(c)(9).

represent him.[2]  However, in the midst of pretrial matters, defendant changed his mind on October 27, saying he wanted to represent himself.  Yet, the next day, he retracted his request to represent himself, advising the court he wanted to be represented by OPD counsel.

A week later on November 5, during pretrial motions' argument, the "merry-go-round" continued; defendant changed his mind again, informing the court he wanted to represent himself.  After the court extensively voir dired defendant, including an explanation of the charges and the potential sentences if convicted, OPD counsel was relieved and ordered to be stand-by counsel for defendant.

Prior to commencement of another pretrial hearing two weeks later, defendant wanted OPD counsel removed as stand-by counsel.  Defendant stated he did "not feel comfortable with [OPD counsel] as his assistant" because OPD counsel told him there would be "[twelve] white ladies from Woodcliff Lakes" as jurors and he would be found guilty.  The court responded by detailing all the equivocal statements defendant made about representing himself, and then ordered OPD counsel to continue serving as stand-by counsel.  After defendant

---

[2]  In fact, two attorneys from the OPD were assigned to represent defendant. Because it appears one attorney was considered the lead counsel, for ease of reference, we refer to them collectively in the singular.

4                                                                        A-1318-16T4

again complained about OPD counsel and the OPD generally to justify his demand to proceed without a stand-by counsel, the court rejected his request, declaring:

> I think you understand or at least have a grasp how – of your strategy and how you want to try this case. So, I'm not concerned about your capacity to try this case on your own with assistance from a public defender. So, I'm not going to excuse the stand-by counsel because I think that would be critical and would be prejudicial to your case.
>
> []I've observed[;] you have used [OPD counsel] repeatedly for legal questions. you have turned to him for legal advice . . . but there are certain legal issues that you have to understand and I'm going to protect the process and this trial.

The court reminded defendant the role of stand-by counsel was to advise on things like how to admit items into evidence but was not to help him strategize or conduct examinations of witnesses.

On December 8, the first day of trial, the confusion produced by defendant continued. In the morning, the court declined defendant's request that OPD counsel be replaced with his "jailhouse lawyers," two fellow inmates, to act as stand-by counsel. But by the end of the day, OPD counsel informed the court defendant was having doubts about representing himself, which defendant confirmed.

5

The next day, defendant gave several reasons for not wanting to represent himself and sought a postponement of the trial. The State objected, arguing defendant was lying and attempting to manipulate the system, which he had been doing throughout the prosecution of his charges. Finding both defendant's representations lacking credibility and the need to protect the integrity of the proceedings, the court denied defendant's requests.

Defendant, however, eventually got the postponement he wanted when the court declared a mistrial due to juror misconduct because a juror advised other jurors she knew a witness from middle school.

Proceeding with an abundance of caution in scheduling a new trial date, the court asked defendant if he wanted to represent himself. Defendant replied he wanted OPD counsel to represent him; OPD counsel agreed to do so.

<u>Third Trial and Pretrial Proceedings</u>

Three months later on March 2, 2016, when the new trial was set to commence, defendant again wanted OPD counsel relieved as his counsel. OPD counsel was accused of not keeping defendant informed, which OPD counsel denied. The court rejected the request, viewing it as another delay tactic by defendant.

Undeterred, defendant disrupted jury selection when he stood up and stated in front of the jury panel that he had fired his attorney while pointing to OPD counsel. The jury panel had to be dismissed. The court strongly admonished defendant of the possibility of being held in contempt if he continued to intentionally disrupt the proceedings.

Fourth Trial and Pretrial Proceedings

On March 15, the court questioned defendant about a letter he wrote to the court alleging OPD counsel harassed and assaulted him on about February 23 or 24, and his renewed request to represent himself. In response to the letter, OPD counsel and the OPD moved to be completely relieved from defendant's case. Among the many cited reasons in a responsive letter brief to the court, the OPD claimed it could no longer represent defendant due to his continued pattern of pervasive false accusations, refusal to cooperate, and his "abusive," "manipulative," and "antagonistic" conduct towards OPD counsel which "appear[ed] to be part of a larger strategy to – resolution in this case." Defendant, according to the OPD, thereby forfeited his right to counsel.

After questioning defendant about waiver of his right to counsel, the court allowed him to represent himself once again. When the court denied him the right to demand who would serve as his stand-by counsel, defendant stated he

A-1318-16T4

would proceed without stand-by counsel. At no point, did he ask for the opportunity to hire private counsel. The court ordered OPD counsel relieved from representing defendant, who had forfeited his right to counsel at public expense based upon his conduct. United States v. McLeod, 53 F.3d 322, 325 (11th Cir. 1995). Defendant mentioned he needed the help of an OPD investigator "to look . . . [for] records," but when the court noted the trial was about to start, he accepted the fact that none could be provided and stated, "I'm ready to go to trial."

The State presented the testimony of Katie; Demi, Katie's mother and defendant's ex-girlfriend and mother of his daughter, Anna; Sergeant Tara Jennings of the Bergen County Prosecutor's Office who investigated Katie's allegations; and the State's expert Dr. Anthony D'Urso, a licensed clinical psychologist.

Katie, twenty-three years old when she testified, stated she was sexually abused by defendant after she, her mother, and her baby sister had moved to Teaneck from Maryland in May 2001. She was nine years old when defendant, who was briefly staying at the house after helping them move, called her from her second-floor bedroom into the hallway. She recalled two occasions when defendant kissed her using his tongue inside her mouth while lying on top of her

as she laid on the hallway floor. On another occasion, she claimed defendant moved her underwear down her legs, and while kissing her, inserted his fingers into her vagina. Testifying she was in shock; she did not scream or yell for help. At the time the assaults occurred, her grandmother, who operated a child day care on the first floor, was either inside the house or outside with the children she cared for.

Katie did not report the assaults until she was a high school sophomore. When asked by the prosecutor why she did not tell her mother about the incidents right after they happened, Katie responded, "[a]side from the fact that [defendant] told me not to tell anyone, I was scared to tell anyone because I just didn't know, like, what was going to happen after that." She did not remember how it had made her feel during or right after the insertion, but recalled as she got older, it made her feel "disgusting." She eventually told her mother because she was:

> having issues with a relationship I was in, in high school. It was my first boyfriend. And things just seemed to be going completely wrong. And I felt like a part of the reason was because of me. And what happened to me. And because I didn't know how to deal with what happened to me. And I felt like I was just kind of ruining everything.

Demi testified that after her family moved to her parents' house in Teaneck in the spring of 2001, defendant stayed with them for about three weeks. During the first two weeks, Katie was out of school waiting for her Maryland school records to arrive so she could be enrolled. She was watched during the day by her grandmother, while Demi was attending a program to become eligible for social services. Demi recalled it was not until February 2009, when an extremely sad Katie told her that defendant had "molested her," but she gave no details.

Demi did not report Katie's allegations until a few days later because she had to "find out what process I should go through because of things that happened in another state." Because this was a reference to defendant's conviction in Maryland for sexually assaulting Katie there, a side bar occurred. Ultimately, the court and defendant decided to withdraw the question and strike the testimony. On defendant's cross-examination, Demi admitted she had no idea Katie was abused in Teaneck.

The State's next witness, Jennings, testified regarding her approximately hour-long interview with Katie in March 2009. She also discussed her interviewed with Demi. Jennings also disclosed her inspection of the house

where Katie claimed the sexual abuse occurred. Her description of the house and its layout matched the description Kate gave to the jury.

Dr. D'Urso testified regarding Child Sexual Abuse Accommodation Syndrome (CSAAS). Explaining the history of CSAAS after child sex abuse became criminalized in the 1980s, the doctor stated it was intended to be:

> [E]ducation for the court, for the jury to see as a backdrop of information. It's not for diagnosis reasons. It's not for proof. It's not something where you could say if there are five elements of this and the child has four of them there's a probability -- not meant for any of that. It's simply meant to help juries, triers of fact, to understand the dynamics of child sexual abuse to be applied in the way that you might apply them.

He then gave a detailed description of the five elements: secrecy, helplessness, entrapment, delayed disclosure, and retraction. In doing so, he asserted it was common for child victims of sex abuse to engage in secrecy and thus delay disclosing their abuse. Dr. D'Urso, who never met Katie, could not opine that she was in fact abused. In fact, the court sustained the State's objections to defendant's pointed cross-examination seeking Dr. D'Urso to state whether Katie was abused by him.

In admitting the CSAAS testimony, the court issued the standard model jury instruction about expert witness testimony in addition to giving a special instruction cautioning about CSAAS testimony based on the Model Jury

11

Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev.

May 16, 2011).  The court also instructed:

> The law recognizes that stereotypes about sexual assault complaints may lead some of you to question [Katie]'s credibility based solely on the fact that she did not complain about the alleged abuse earlier.  You may or may not conclude that her testimony is untruthful based only on her delayed disclosure.  You may consider the delayed disclosure along with all other evidence including [Katie]'s explanation for her delayed disclosure in deciding how much weight, if any, to afford her testimony.  You may also consider the expert testimony that explained that delay is one of the many ways in which a child may respond to sexual abuse.
>
> [Y]our deliberations in this regard should be informed by the testimony presented concerning [CSAAS].
>
> You may recall evidence that [Katie] failed to disclose, or acted or failed to act in a way addressed by [CSAAS].  In this respect, Dr. D'Urso testified on behalf of the State, and is qualified as an expert as to [CSAAS].  You may only consider the testimony of this expert for a limited purpose. . . .
>
> You may not consider Dr. D'Urso's testimony as offering proof that child sexual abuse occurred in this case.  [CSAAS] is not a diagnostic device and cannot determine whether or not abuse occurred. It relates only to a pattern of behavior of the victim which may be present in some child sexual abuse cases.
>
> You may not consider expert testimony about [CSAAS] as proving whether abuse occurred or did not occur. Similarly, you may not consider that testimony as

proving, in and of itself, that Katie, the alleged victim here, was or was not truthful.

Dr. D'Urso's testimony may be considered as explaining certain behavior of the alleged victim of child sexual abuse . . . . if proven, may help explain why a sexually abused child may delay reporting sexual abuse.

To illustrate, in a burglary or theft case involving an adult property owner, if the owner did not report the crime for several years, your common sense might tell you that the delay reflected a lack of truthfulness on the part of the owner. In that case, no expert would be offered to explain the conduct of the victim, because that conduct is within the common experience and knowledge of most jurors.

Here, Dr. D'Urso testified that, in child sexual abuse matters, children respond differently than do adult victims. This testimony was admitted only to explain that the behavior of the alleged victim was not necessarily inconsistent with sexual abuse.

The weight to be given to Dr. D'Urso's testimony is entirely up to you. You may give it great weight or slight weight, or any weight in between, or you may, in your discretion, reject it entirely.

You may not consider the expert testimony as in any way proving that defendant committed, or did not commit, any particular act of abuse. Testimony as to [CSAAS] is offered only to explain certain behavior of an alleged victim of child sexual abuse.

As mentioned, the jury found defendant guilty of both charges. The court denied his motion to set aside the verdict. Defendant was subsequently

13

sentenced to a sixteen-year prison term subject to an eight-year parole disqualifier, concurrent to a four-year prison term. However, as noted, a fourth amended JOC mistakenly provided the sixteen-year term was subject to NERA. Defendant's sentences were consecutive to his Maryland sentence for sexually abusing Katie.

In his appeal, defendant agues:

POINT I

THE JURY'S EXPOSURE TO UNRELIABLE EXPERT TESTIMONY REGARDING [CSAAS], COUPLED WITH PREJUDICIAL JURY INSTRUCTIONS REGARDING SUCH TESTIMONY, REQUIRES REVERSAL. (NOT RAISED BELOW).

A. As Determined Pursuant to the Supreme Court's State v. J.L.G.[3] Remand Order, Evidence Concerning Child Sexual Assault Accommodation Syndrome Fails the Reliability Requirement Under N.J.R.E. 702.

B. The Court Improperly Bolstered the CSAAS Testimony By Issuing Both the CSAAS Model Jury Charge and the Expert Jury Charge.

C. The Cumulative Impact of These Errors Warrant[] Reversal of [Defendant's] Convictions.

---

3 State v. J.L.G., 234 N.J. 265 (2018).

A-1318-16T4

POINT II

[DEFENDANT] DID NOT KNOWINGLY WAIVE HIS RIGHT TO COUNSEL. MOREOVER, THE COURT'S FAILURE TO APPOINT STAND[-]BY COUNSEL WAS FUNDAMENTALLY ERRONEOUS.

A. [Defendant] Did Not Knowingly and Intelligently Waive His Right to Counsel, Given that the Court Failed to Advise Him of the Elements of the Charged Offenses and Possible Defenses.

B. When [Defendant] Claimed His Attorney Physically Assaulted Him, the Court Should Have Ruled that attorney was Conflicted Out of the Case, Rather than Ruling It Was Grounds for [Defendant] to Represent Himself.

C. The Court Should Have Appointed Stand[-]by Counsel.

POINT III

GIVEN THAT THE ENDANGERING THE WELFARE INSTRUCTION ENCOMPASSED BOTH DIGITAL PENETRATION AND KISSING ON THE MOUTH, AND THE JURY WAS NEVER ISSUED A UNANIMITY CHARGE OR A SPECIAL INTERROGATORY, THE CONVICTION ON THAT COUNT IS FATALLY FLAWED, AND MUST BE REVERSED. (NOT RAISED BELOW).

POINT IV

DURING ITS PRELIMINARY INSTRUCTIONS, THE COURT ERRONEOUSLY CHARGED THE

15

JURY ON REASONABLE DOUBT.  (NOT RAISED BELOW).

POINT V

THE CASE SHOULD BE REMANDED FOR RESENTENCING, BECAUSE THE SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE.

A. The 85% Parole Ineligibility Period Must Be Removed From the Sentence, Because the Charged Offenses Occurred Before the 'New NERA' Statute Went into Effect.

B. The Court Ascribed Undue Weight to Aggravating Factor Three Based on [Defendant]'s Classification as Repetitive and Compulsive, Given that He Will Likely Undergo Rehabilitative Treatment and Will Be Supervised Upon Release.

C. [Defendant] Is Entitled to Over Two Years of Prior Service Credit.

Defendant's reply brief argues:

POINT I

WITHOUT CONDUCTING AN ADEQUATE VOIR DIRE, KNOWLEDGE AND UNDERSTANDING OF THE ESSENTIAL ELEMENTS AND DEFENSES OF THE CHARGES CANNOT BE IMPUTED TO A PRO SE DEFENDANT. THE STATE'S ASSERTION OTHERWISE IS WITHOUT MERIT.

Defendant filed a supplemental letter brief, presenting the following point:

A-1318-16T4

STATE V. J.L.G. APPLIES RETROACTIVELY TO THIS CASE, AND THE IMPROPER ADMISSION OF EXPERT TESTIMONY ON [CSAAS] REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

A. J.L.G. Announced A New Rule of Law: Expert Testimony About CSAAS Is Inadmissible. That New Rule Should Be Accorded Complete Retroactivity, Or at The Very Least, Pipeline Retroactivity. When That New Rule Is Applied to This Case, It Necessitates Reversal of Defendant's Convictions.

i. Because the new rule rectifies a problem in the law that substantially impaired the jury's truth-finding function, it must be given full retroactive effect. In the alternative, pipeline retroactivity is required.

ii. The improper admission of CSAAS expert testimony in this case was harmful error.

II.
A.

We begin by addressing defendant's contention the trial court erred by allowing Dr. D'Urso to provide CSAAS testimony in light of J.L.G.'s holding that the testimony is not sufficiently reliable expert testimony, and his claim the trial court improperly bolstered the testimony by charging the jury on both CSAAS and expert witness testimony. Because no objection was made at trial, we review the issue for plain error.

Under the plain error standard, we disregard any error or omission by the trial court "unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2; see also State v. Santamaria, 236 N.J. 390, 404 (2019). "To warrant reversal[,] . . . an error at trial must be sufficient to raise 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

During the pendency of this appeal, our Supreme Court issued its opinion in J.L.G., where it partially overturned its holding in State v. J.Q., 130 N.J. 554 (1993). The Court held:

> Based on what is known today, it is no longer possible to conclude that CSAAS has a sufficiently reliable basis in science to be the subject of expert testimony. We find continued scientific support for only one aspect of the theory — delayed disclosure — because scientists generally accept that a significant percentage of children delay reporting sexual abuse.
>
> We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials. Evidence about delayed disclosure can be presented if it satisfies all parts of the applicable evidence rule. In particular, the State must show that the evidence is beyond the understanding of the average juror.

18

[J.L.G., 234 N.J. at 272 (citing N.J.R.E. 702) (emphasis added).]

The Court recognized the limited admissibility of CSAAS expert testimony "will turn on the facts of each case." 234 N.J. at 272. Thus, when a victim gives "straightforward reasons about why [he or] she delayed reporting abuse, the jury [does] not need help from an expert to evaluate [his or] her explanation. However, if a child cannot offer a rational explanation, expert testimony may help the jury understand the witness's behavior." Ibid. Although J.L.G. permits expert testimony about delayed disclosure or causes for delayed disclosure; "[t]he testimony should not stray from explaining that delayed disclosure commonly occurs among victims of child sexual abuse, and offering a basis for that conclusion." Id. at 303. For example, we subsequently found it improper for a CSAAS expert to testify that the five CSAAS categories of behavior "may be behaviors exhibited by a truthful child sex abuse victim." State v. G.E.P., 458 N.J. Super. 436, 450-51 (App. Div. 2019). Admissibility of CSAAS expert testimony, nevertheless, may be harmless "in light of the overwhelming evidence of [a] defendant's guilt." J.L.G., 234 N.J. at 306.

Because the J.L.G. Court did not opine with respect to whether its holding applied retroactively, we directly addressed the issue in G.E.P. We held the J.L.G. holding "should be given at least pipeline retroactivity," rendering it

applicable to all cases in which the parties have not exhausted all avenues of direct review when the Court issued its opinion in J.L.G. G.E.P. 458 N.J. Super. at 448. Since this is the situation here, J.L.G. applies to defendant's appeal.

Guided by the principles of J.L.G., we conclude there was no plain error in the admission of Dr. D'Urso's CSAAS testimony. The court's jury instructions on expert testimony, along with the special CSAAS jury instructions that Dr. D'Urso did not know anything about the specific facts and circumstances of Katie's allegations, mitigated the negative impact his testimony may have had on the jury. We find no merit to defendant's contention the issuance of both the expert testimony and CSAAS testimony jury charges impermissibly created an impression that Dr. D'Urso rendered an opinion that Katie's allegations were credible.

Clearly, the jury had to resolve the credibility of Katie's approximately six-year delay in reporting defendant's assault. Even though a child sex-abuse victim's delayed response was an element of Dr. D'Urso's CSAAS testimony, he did not opine – and the jury was directed not to imply from his testimony – that Katie's delayed disclosure proved she was assaulted by defendant. The jury had the benefit of evaluating Katie's credibility based upon her testimony that as a nine-year old sex abuse victim, she felt threatened by her abuser and was

uncertain what might occur if she told someone, in contrast with her more mature revelation to her mother as a teenager concerning the sexual confusion she was struggling with in her first boyfriend relationship, which she harkened to the disgusting experience of defendant's abuse. Based upon our review of the record, there was no questioning or evidence undermining Katie's testimony. The jury had to accept or reject her testimony at face value. Considering her testimony coupled with the court's expert and CSAAS jury instructions, we cannot conclude Dr. D'Urso's CSAAS testimony produced the unjust result of a guilty verdict.

B.

Defendant contends reversible error occurred because he did not knowingly waive his right to counsel because the court: (1) was deficient in inquiring if defendant knowingly and intelligently waived away his right to counsel; (2) omitted options for defendant's representation by private counsel following his claim of assault by OPD counsel; and (3) failed to appoint stand-by counsel. Contrary to our prior conclusion in K.M.B. that a remand was in order because defendant's constitutional right to represent himself was denied, we find no merit to any of these contentions related to his subsequent self-representation.

21

At the risk of being repetitive from K.M.B., we reiterate defendant's right to self-representation is well settled. A criminal "[d]efendant possesses both the right to counsel and the right to proceed to trial without counsel." State v. DuBois, 189 N.J. 454, 465 (2007). In State v. Crisafi, 128 N.J. 499, 509 (1992), the Court explained a defendant may "exercise the right to self-representation only by first knowingly and intelligently waiving the right to counsel."

> [W]hen determining whether a waiver of counsel is knowing and intelligent, trial courts must inform defendant of: (1) the nature of the charges, statutory defenses, and possible range of punishment; (2) the technical problems associated with self-representation and the risks if the defense is unsuccessful; (3) the necessity that defendant comply with the rules of criminal procedure and the rules of evidence; (4) the fact that lack of knowledge of the law may impair defendant's ability to defend himself; (5) the impact that the dual role of counsel and defendant may have; and (6) the reality that it would be unwise not to accept the assistance of counsel.
>
> [DuBois, 189 N.J. at 467 (citing Crisafi, 128 N.J. at 511-12).]

In State v. Reddish, 181 N.J. 553 (2004), the Court added additional requirements to the process, specifically that:

> (1) the discussions should be open-ended for defendants to express their understanding in their own words; (2) defendants should be informed that if they proceed pro se, they will be unable to claim they provided ineffective assistance of counsel; and (3)

22

defendants should be advised of the effect that self-representation may have on the right to remain silent and the privilege against self-incrimination.

[DuBois,189 N.J. at 468 (citing Reddish, 181 N.J. at 594-95).]

"A defendant's right of self-representation is not absolute, however, and it cannot be used to jeopardize the State's equally strong interest in ensuring the fairness of judicial proceedings and the integrity of trial verdicts." State v. King, 210 N.J. 2, 18 (2012) (citing State v. McNeil, 405 N.J. Super. 39, 51 (App. Div. 2009)). "There may be times . . . when the defendant will be required to cede control of his defense to protect the integrity of the State's interest in fair trials . . . ." Reddish, 181 N.J. at 587.

When making inquiry, however, the judge's "goal is not to explore a defendant's familiarity with 'technical legal knowledge[,]' for that is not required." King, 210 N.J. at 19 (alteration in original) (quoting Reddish, 181 N.J. at 595). "Rather 'the trial court must question [the] defendant to ascertain whether he actually understands the nature and consequences of his waiver.'" Ibid. (quoting Reddish, 181 N.J. at 594). Finally, if the appropriate colloquy is conducted and it is determined the defendant's waiver of counsel is knowing and voluntary, that choice "must be honored" even if the court feels it is a "poor" or

"unwise" one. State v. Gallagher, 274 N.J. Super. 285, 296 (App. Div. 1994); State v. Thomas, 362 N.J. Super. 229, 242-43 (App. Div. 2003).

Based on our review of the record, we are convinced that throughout the entirety of the numerous proceedings where the court interacted with defendant following our remand, these principles were followed, and defendant's right to counsel was not denied. Specifically, the State correctly points to: (1) the October 27, 2015 voir dire of defendant and his decision to retain OPD counsel; (2) the November 5, 2015 self-representation request and voir dire; (3) defendant's complaints about OPD counsel as stand-by counsel; (4) defendant's request to be relieved of OPD counsel as stand-by counsel November, 18, 2015; (5) his request to have OPD counsel, as stand-by counsel, step in to represent him on the second day of trial December 9, 2015; (6) the request for representation by OPD counsel following the mistrial; (7) defendant's March 2, 2016 accusations that OPD counsel was keeping him in the dark, and his request to fire OPD counsel was denied; (8) defendant's outburst during the jury voir dire stating he was firing OPD counsel; (9) defendant's letter accusing OPD counsel of assaulting him and his subsequent pro se request; (10) defendant's March 10, 2016 voir dire; and (11) the motion by OPD counsel to be relived as counsel and the letter from the OPD read into the record.

While the court never explained to defendant on the record in "colloquial terms" the language of his indictment to ensure he understood the charges, it is apparent from the November 5, 2015 voir dire that defendant was fully aware of the charges against him and that he understood them.  In fact, he was astute enough to correct the court that his first-degree conviction was not subject to NERA.  And even though his summation left a lot to be desired, his argument that there was no proof of assault was a logical theory given there was no corroborative evidence of Katie's accusations.

We also find no merit to defendant's claim the court erred in not providing him stand-by counsel.  The appointment of stand-by counsel for a self-represented defendant is mandatory only in capital cases. Reddish, 181 N.J. at 603-04.  Nevertheless, it is "long recognized by our case law" that the courts should "assign 'stand-by' counsel to aid and advise a pro se litigant." State v. Slattery, 239 N.J. Super. 534, 549 (1990); see also State v. Sinclair, 49 N.J. 525, 552 (1967).  The trial court did not abuse its discretion in not assigning stand-by counsel to defendant. Defendant had already represented himself with stand-by counsel during the second trial that ended in a mistrial due to juror misconduct.  After the court granted the motion by OPD counsel to be discharged and the OPD was relieved as counsel due to defendant's belated

A-1318-16T4

assault allegations against OPD counsel and defendant's "manipulative" and "antagonistic" behavior, defendant neither requested stand-by counsel nor the opportunity to retain private counsel. And considering, defendant was continually represented by the OPD until the court relived it from representing defendant, there is no indication in the record that defendant's ability to retain private counsel was realistic, or just another attempt to avoid a fair and just adjudication of Katie's accusations. Considering defendant's apparent strategy to repeatedly abuse the criminal justice system regarding his right to legal representation, we discern no reason why the court had to sua sponte appoint an attorney to serve as stand-by counsel or afford him time to retain private counsel.

## C.

Defendant raises another plain error contention that the court should have issued a special unanimity instruction or a verdict sheet requiring the jury to express a unanimous verdict as to either the open-mouthed kissing or digital insertion theories because the State proffered to prove the charge of endangering a minor. We see no unjust result.

To be sure, a jury verdict must be unanimous to convict a defendant of a crime. State v. Parker, 124 N.J. 628, 633 (1991); see also R. 1:8-9. "[T]he unanimous jury requirement impresses on the trier of fact the necessity of

26

reaching a subjective state of certitude on the facts in issue." Parker, 124 N.J. at 633 (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)). The consensus of a jury requires "substantial agreement as to just what a defendant did." State v. Frisby, 174 N.J. 583, 596 (2002) (quoting Gipson, 553 F.2d at 457). In most instances, a general unanimity instruction will suffice without any special additional instructions. Id. at 597. Such a special instruction may only be necessary in situations where:

> (1) a single crime could be proven by different theories supported by different evidence, and there is a reasonable likelihood that all jurors will not unanimously agree that the defendant's guilt was proven by the same theory; (2) the underlying facts are very complex; (3) the allegations of one count are either contradictory or marginally related to each other; (4) the indictment and proof at trial varies; or (5) there is strong evidence of jury confusion.
>
> [State v. Cagno, 211 N.J. 488, 517 (2012) (citing Frisby, 174 N.J. at 597).]

As the Court explained in Parker, when a series of alleged criminal acts committed by a defendant involves acts that are "conceptually similar," no special jury instruction on unanimity is required to segregate those acts. 124 N.J. at 639.

The State's theory that defendant endangered a minor through kissing or digital penetration are conceptually similar. The theories are not completely

27

distinct sets of events leading to the outcome; the kissing and insertion are alleged to have taken place as a single set of acts, not as separate theories of events. There is no genuine possibility of jury confusion about its responsibility to unanimously find defendant's conduct endangered the morals of Katie. The allegations are not confusing, nor contradictory. Consequently, the lack of a unanimity charge did not cause an unjust result, let alone mere error by the court.

## D.

As for the remaining arguments raised by defendant, including those raised in his self-represented supplemental brief, they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2).

Affirmed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1318-16T4