**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3597-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RASHAWN BOND,

     Defendant-Appellant.

_____

Argued May 11, 2021 – Decided May 27, 2021

Before Judges Yannotti, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 10-03-0288.

Roy B. Greenman argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Ruth E. Hunter, Designated Counsel, on the brief).

Milton S. Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor argued the cause for respondent (Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney; Milton S. Leibowitz, of counsel and on the briefs).

Appellant filed pro se supplemental briefs.

PER CURIAM

Defendant Rashawn Bond appeals from a March 29, 2019 order denying his motion for reconsideration of a prior order denying his motion for a new trial. We affirm in part and remand in part for further fact finding by the motion judge. We also remand for resentencing in accordance with our prior decision in State v. Bond, No. A-2317-14 (App. Div. Oct. 18, 2017) (slip op. at 18).

By way of background, defendant, Jamel Lewis, Robert Harris, Titus Lowery, and Sharif Torres planned to rob Raheem Jackson, who was a drug dealer and the boyfriend of Tanya Worthy. They planned to stage a robbery and kidnap Worthy while she was with defendant.

On the evening of October 28, 2008, Worthy ordered dinner at a restaurant in Newark, and afterwards she went to defendant's home. Lewis, Harris, Torres, and Lowery arrived there. They pretended to rob defendant and then kidnapped Worthy. Lewis and Lowery drove Worthy to Jackson's home in Green Brook. Defendant was supposed to follow them. He borrowed a car from his girlfriend, Jasmine Campbell. Defendant, Harris, and Torres drove to Green Brook.

Lewis and Lowery arrived at Jackson's home. When Jackson opened the door to his garage, he saw a masked man with a gun exit Worthy's car. The man told Jackson not to move. Jackson closed and locked the garage door.

2

Defendant and the other perpetrators left Jackson's home. Defendant drove to Elizabeth, where Worthy's car was set on fire. She was in the back seat. She had previously been shot and killed. Defendant then traveled back to Newark, went to his girlfriend's home, returned her car, and handed her a Gucci handbag that belonged to Worthy.

Trial began on April 1, 2014. That day, prior to jury selection, the trial judge conducted an in camera review of letters produced by the State written by Sean Williams, a cooperating State's witness. The letters were written to: Detective Joe Vendas of the Union County Prosecutor's Office and lead investigator in this matter; an investigator who worked at the Union County jail in gang intelligence; and the prosecutor trying this case. The prosecutor sought to redact identifying information about Williams's family before the letters were turned over. She noted, however, that a letter about Williams's cooperation with law enforcement "needs to be disclosed . . . ." The trial judge agreed the redactions were appropriate and the fact of Williams's cooperation was relevant.

The prosecutor also noted the letters referenced Lewis, who was alleged to be a South Side Cartel (SSC) gang member. In his letters, Williams claimed Lewis asked him to retract his statements implicating Lewis and defendant in the underlying crimes. One of defendant's key defenses at trial was that he

participated in the underlying crimes under duress by Lewis who had killed defendant's brother Abdul Billups and defendant's longtime friend Jermaine Hinnant. The trial judge stated he would review the proposed redactions.

On April 3, 2014, the trial judge conducted a sealed proceeding during which Williams's cooperation was discussed. The State disclosed that Vendas had a "stack" of letters from Williams relating to his cooperation in a federal case involving the MS13 gang. The State offered to produce them but did not think they were relevant to defendant's case. The trial judge stated the letters "had little to do with impeachment of the witness and his credibility . . . [but could] come up during cross-examination" and therefore could bear upon a trial issue. The judge granted the State's request for certain redactions.

On April 8, 2014, defense counsel moved to reconsider the trial judge's decision regarding the extent of the redactions, arguing the letters were relevant to Williams's credibility. The judge ruled he would unseal the letters and review them again in light of the issues involving the SSC, and other cases in which Williams cooperated. On April 23, 2014, the judge indicated he received another set of letters and that he made redactions "in counsel's presence, and everything ha[d] been turned over," including two letters found the night before.

4

On April 30, 2014, after thirty days of trial, the trial judge announced a new development, namely, the discovery of notes taken by Vendas during his initial interview of Williams in December 2009, which had not been produced before. Following the entry of a protective order, the notes were turned over to defense counsel.

On May 7, 2014, defense counsel moved for a mistrial alleging prosecutorial misconduct relating to the late discovery of Vendas's notes. Counsel claimed the discovery was "quite exculpatory . . . ." The judge found the State's late discovery was unintentional and denied the motion.

At trial, Vendas testified on behalf of the State regarding the investigation, including his interview of Williams. In our prior decision, we recounted the following:

> Vendas's handwritten notes of his "pre-interview" with Williams . . . were produced to the defense during the trial. Vendas testified he forgot he took those notes. He wrote down that Williams told him that . . . Lewis[] was associated with the 793 Bloods gang, which had an affiliation with the SSC. Williams also told him Lewis carried a .357 revolver, which was consistent with the caliber of bullets that killed Worthy; that . . . Lewis and Billups killed . . . Hinnant; and that somebody named "Farad" killed . . . Billups.
>
> [Bond, slip op. at 4.]

A-3597-18

Williams testified for the State pursuant to a plea deal. He acknowledged he was cooperating with other law enforcement agencies in multiple cases, which he hoped would secure him a reduced sentence. He stated that several days before the murder, he spoke with Lewis, who told him about a planned robbery of one of defendant's girlfriends. Williams stated Lewis wanted him to steal a car for the robbery, and said defendant would pay him to do so. Lewis did not give Williams any other details regarding the robbery.

In our prior decision we also noted the following:

> Williams stated he knew, from growing up in Newark, that the [SSC] was a subset of the Bloods gang and had a reputation for violence. While he and Lewis were in the Union County Jail, Lewis and other members of the [SSC] threatened him about his statements and testimony in this case. On February 8, 2012, he wrote a letter to Vendas, which read:

> > To Detective Joe Vendas From Sean L. Williams. I am writing in regards to the recorded statement I gave to you on December 24th, '09 regarding a Mr. Jamel Lewis and Rashawn Bond. I'd like to inform you that any statement or testimony that I gave to the Union County Prosecutor's Office on December 24th, '09 is false. Any statement I, Sean Williams, made that is relative to the murder of Miss Tanya Worthy against the defendants Jamel Lewis and Rashawn Bond is false.

6

> Williams claimed he wrote the letter at "a time when I was gettin' threatened again."
>
> [Ibid.]

Williams was not asked and did not identify defendant as a member of the SSC.

Williams testified he wrote over twenty letters to the prosecutor and detective in his case in order to obtain a better plea deal, and wrote to the prosecutor and detective in defendant's case complaining defendant's case was holding up the disposition of Williams's case. The letters were dated from October 2009 to June 2014, and consistent with his testimony, their contents ranged from cooperation, to anger at perceived inaction on his behalf, to a desire to retract his statements.

Defendant testified he acted under duress from Lewis. He testified "Lewis was [his] cousin and belonged to the 793 gang, which was affiliated with the [SSC]." Id. at 5. Defendant claimed Lewis had Billups, who was an SSC member, killed and afterwards Lewis told defendant "don't be mad at me, but your brother had to go, we couldn't take no chances of [him] taking us all down." Ibid. Defendant testified that after Billups's murder, Lewis regularly went to defendant's home and defendant was afraid to ask him to leave. Defendant testified Lewis also killed Hinnant for giving a statement to police about Lewis.

A-3597-18

Defendant said he committed the offenses because he was afraid that Lewis or another member of the SSC would kill him if he did not do what Lewis asked. He stated after Lewis explained the plan, he "pulled out a .357, put it on his lap, and said, 'man don't be stupid like your brother, . . . don't make me kill you . . . .'" Ibid. (first alteration in original). Defendant testified he did not refuse because "[t]hat's like committing suicide, man. You know, you just don't tell a person like that." Ibid. (alteration in original). Defendant denied killing Worthy or being present when she died. He claimed he gave Worthy's handbag to Campbell because Torres put the gun in it, and he did not want to "ride around with that gun in that car."

Defendant testified he received a threat from Lewis's brother in June 2009 after defendant decided to tell the truth about what happened to Worthy. He also received a threat from Roland's brother reminding him what happened to Billups. The jury also heard testimony from defendant that he had weapons convictions in 2000 for which he had served two years in prison, that he was arrested in January 2009 on a separate federal drug charge, served time in federal prison, and was in protective custody in the Union County jail.

The trial concluded on May 14, 2014. The jury convicted defendant of first-degree kidnapping, N.J.S.A. 2C:13-1(b); first-degree robbery, N.J.S.A.

2C:15-1(a); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); and a lesser included offense of third-degree receiving stolen property, N.J.S.A. 2C:20-7.

In November 2014, at the request of defense counsel, the trial judge held a "brief testimonial hearing" to address, among other things, the State's late production of Vendas's notes. Defendant moved for a new trial arguing the notes supported his duress defense and the State was grossly negligent by failing to produce them until during Vendas's testimony. The judge denied the motion. Sentencing occurred later that month.

Defendant appealed from his convictions and sentence in January 2015. Among other arguments raised on the first appeal, defendant asserted the State violated <u>Brady v. Maryland</u>[1] and breached its duty to provide discovery under the court rules as related to Vendas's notes. <u>Bond</u>, slip op at 1. We considered and rejected those arguments as without merit. <u>Id.</u> at 17.

Defendant also "contend[ed] his sentence is excessive, that the court engaged in impermissible 'double counting,' and that the court should have found mitigating factor four (N.J.S.A. 2C:44-1(b)(4): 'There were substantial grounds tending to excuse or justify the defendant's conduct, though failing to

---

[1] 373 U.S. 83 (1963).

establish a defense[,' namely, defendant's duress argument).]."' Id. at 17. We

stated:

> Defendant's argument as to mitigating factor four is not persuasive. The court considered defendant's duress argument at sentencing and rejected it, just as the jury did.
>
> We conclude, however, that the sentencing court improperly considered the arson in finding aggravating factor one. Defendant was acquitted of arson. Nevertheless, the court determined that the arson "exhibit[ed] the heinous nature of all the actors in this case," including defendant. Because defendant was acquitted of arson, the court should not have considered that evidence against defendant in applying aggravating factor one. See State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989) ("Although a defendant may be vicariously accountable for the crimes his accomplice commits, he is not vicariously accountable for aggravating factors that are not personal to him."), aff'd, 124 N.J. 113 (1991).
>
> Additionally, it appears that the court engaged in prohibited "double counting" by considering "the gravity and seriousness of harm inflicted on the victim" as an aggravating factor. Prohibited "double counting" occurs when the court considers one of the required elements of the offense charged as an aggravating factor. See State v. Yarbough, 100 N.J. 627, 633 (1985) (finding facts that the Legislature has incorporated into the Code as part of the original grading of the offense are not to be weighed as aggravating and mitigating factors to arrive at the appropriate sentence), cert. denied, 475 U.S. 1014 (1986).

"It is well-settled that where the death of any individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes." State v. Carey, 168 N.J. 413, 425 (2001). Thus, because defendant was convicted of felony-murder, "the gravity and seriousness of harm" inflicted on the victim should not have been considered in determining the aggravating factors. Id. at 426. Since the court erred in finding aggravating factor two, we remand for reconsideration of defendant's sentence in the absence of that aggravating factor.

[Bond, slip op. at 18 (alteration in original).]

Defendant filed a petition for certification that was denied. State v. Bond, 233 N.J. 18 (2018).

While defendant's appeal was pending, defense counsel learned Williams was a cooperating witness and had testified in 2016 in a federal case involving the MS13 gang from letters counsel obtained from the Assistant United States Attorney (AUSA) handling the prosecution. Also, in January 2018, Farad Roland entered a guilty plea in a federal RICO case in which Roland admitted the SSC was a criminal enterprise and that he killed Billups for betraying the gang. As a result, defendant filed a motion for a new trial based on newly discovered evidence, which was heard by a different judge.

The motion judge also noted defendant filed a supplemental brief claiming Williams's "testimony as a cooperating witness in a [f]ederal MS13 [gang] case

to the effect that Lewis was a member of a Bloods set, 793[], and the SSC constitutes new evidence warranting a trial."  Defendant also noted Williams testified before a federal grand jury in 2013, and in a federal trial in 2016 during which he identified Lewis as a member of the SSC in the 793 set of the Bloods gang.  Williams also stated there were members of the Bloods and MS13 gangs in the Union County jail, but he had "very very little" knowledge regarding the latter.

Defendant asserted the State's failure to disclose Williams's cooperation in the federal cases against SSC was a Brady violation and the information was material because it could have been used to impeach Williams's credibility at trial.  Defendant also argued an evidentiary hearing was necessary to determine whether Union County Prosecutor's Office Detective Harvey Barnwell, who led the investigation into Hinnant's death, had "information regarding the State's alleged Brady violation in the untimely disclosure of . . . Vendas'[s] notes from his first interview with Williams."

The motion judge denied the motion concluding the parties knew the SSC was subject to an ongoing investigation "in advance of [d]efendant's trial."  The judge cited the April 1, 2018 pre-trial proceeding in which "defense counsel raised the issue of the State producing materials received from the U.S.

12

Attorney's office in this regard."  The judge noted the State "had no issue producing the material" for an in camera review as agreed by counsel. "Reference was also made that defense counsel had had conversations with . . . Barnwell . . . already."

The judge also referenced the April 3, 2014 proceeding during which Williams's "federal cooperation [was] discussed."  He noted the lack of comments by defense counsel in the transcript indicated he was not present. Furthermore, defense counsel informed the motion judge he did not receive the letters relating to Williams's involvement in the MS13 prosecution from the State and obtained them through his own efforts afterwards.  The judge noted the April 3 transcript showed the State

> disclose[d] that . . . Vendas has a "stack" of letters from . . . Williams relating to his cooperation on a federal case involving the gang MS13. . . . A description of the letters is provided[,] and the State indicates that it has no issue producing them, although a relevancy issue is raised.  The [c]ourt sustains the relevancy objection noting that the court doesn't "know the relevance of . . . [Williams] assisting the federal government."  . . . The State did not violate its Brady obligation in not producing this material as the [c]ourt restricted its production.

The judge also reviewed the April 8, 2014 hearing transcript and stated it showed "the defense was aware of . . . William[s's] federal cooperation," noting

defense counsel remarked after reviewing the letters the State produced that it seemed to him there was "a witness here that is cooperating in multiple cases . . . with the State or the federal government . . . ." The judge noted the trial judge stated he would reconsider the production of the redacted information. The motion judge concluded "[t]he MS13 material was not produced due to an order of the court entered as part of a proceeding apparently procedurally agreed to by the parties." He concluded defendant could have raised this ruling on the initial appeal and that we rejected defendant's <u>Brady</u> violation arguments in any event.

The judge found Roland's plea in federal court was not grounds for a new trial because it was nothing new. He noted that at trial defendant testified Roland "was the leader of the SSC and was involved in his brother's murder." The judge noted the State did not dispute these contentions and the jury was able to consider this testimony in its deliberations. Likewise, the judge noted the jury also heard testimony regarding "[d]efendant's asserted fear of Lewis, and the reasons for that alleged fear[, which] . . . [d]efendant testified to . . . in detail." The judge stated: "The fact that Lewis was a violent criminal was before the jury."

The judge concluded as follows:

The jury chose to convict [d]efendant, apparently rejecting his version of events as incredible.

As charged, an issue at [d]efendant's trial was whether a "person of reasonable firmness in a similar situation would have been unable to resist" the coercion of Lewis or the reputation of the SSC. Defendant's testimony in this regard was reasonably found by the jury to be incredible and therefore rejected by the jury. Having an actual admission of the killing by . . . Roland would not make [d]efendant's testimony more credible or make the damning testimony of contrary fact witnesses, such as . . . Campbell regarding the purse, incredible. . . . Roland's plea to what was undisputed at [d]efendant's trial is not evidence likely to alter the outcome of the trial.

The judge also found Williams's testimony in the federal MS13 case was not newly discovered evidence warranting a new trial because Williams's involvement in the investigation was known before trial and "[d]efense counsel had seen . . . Williams's letters to the federal prosecutor in this regard during trial." Moreover, the judge found Williams's testimony that: the SSC was a violent gang and subset of the Bloods; and Williams was receiving threats in jail "directed by . . . Lewis" and was in fear for his safety from Lewis, was presented at defendant's trial. The judge noted "[d]efendant testified that . . . Lewis was a member of the SSC" and Vendas testified about the nature of the 793 and SSC in relation to the Bloods. The judge noted Vendas's testimony "was in conformity with his late-produced notes of his interview of . . . Williams." The

15

judge found defendant could have re-called Williams to the stand after receiving Vendas's notes, but declined to do so.

The judge concluded the newly discovered evidence did not constitute a Brady violation and "the testimony of cooperation would [not have] result[ed] in a different verdict as . . . Williams testified extensively [at defendant's trial] concerning his cooperation . . . ." The judge also concluded the trial judge was aware of the MS13 correspondence and did not abuse his discretion by ordering it withheld on grounds of relevancy.

On December 27, 2018, defendant moved for reconsideration. In a written decision, the judge recounted the trial testimony and the procedural history, including our decision and the remand for re-sentencing. He summarized defendant's claims as follows:

> Defendant contends that evidence of [Roland's] guilty plea would corroborate [d]efendant's testimony regarding duress.
>
> In addition . . . the recent discovery of . . . Williams being a cooperating witness in a [f]ederal prosecution of the SSC constitutes new evidence . . . . Defendant argues that the State's failure to disclose Williams'[s] cooperation in the [f]ederal case against the SSC was in violation of the State's Brady obligation. Defendant contends that this information could have been used at trial to impeach Williams'[s] credibility.

16

In a supplemental brief, [d]efendant also argues that information concerning . . . William[s's] cooperation in a federal investigation of MS13 and his testimony as a cooperating witness in that case—to the effect that Lewis was a member of a Bloods set, 793[], and the SSC—constitutes new evidence warranting a trial.

Defendant also argues that an evidentiary hearing is necessary to flesh out what was known about William[s's] cooperation, and who knew it, within the Prosecutor's office. In a similar vein, [d]efendant argues that the State should be ordered to produce the notes of . . . Vendas and Barnwell regarding the [d]efendant's proffer sessions. All but one of the proffer sessions were recorded and the recordings had been turned over to the defense.

The motion judge rejected defendant's argument that the State failed to disclose Williams's cooperation in the federal case against the SSC for the same reasons expressed in his December 24, 2018 decision and made the following additional findings.

First, he noted there was no record of the trial judge's decision following the April 8, 2014 hearing pertaining to Williams's letters regarding his cooperation with federal and state authorities. The judge noted in the search for the documents related to the in camera review "[t]wo sealed envelopes relating to the instant matter with [the trial judge's] writing upon them were found among [a] co-defendant's trial materials. A third envelope was also found within the

records of [a] co-defendant's trial [materials].  The parties have reviewed and

now possess redacted copies of these records."  The judge found as follows:

> In sum, the federal authorities' investigation into the SSC was known to the defense through [d]efendant's personal experiences.  The [d]efense also had a letter where . . . Williams stated that he had information pertaining to the SSC and argued to the court that . . . Williams may be cooperating with the federal government.  However, the State did not disclose the cooperation to the [d]efense.  While the State did inquire of . . . Williams at trial if he was cooperating with "other" law enforcement agencies other than the Union County Prosecutor's Office, one question in the midst of trial is not an appropriate disclosure.
>
> The MS13 material was not produced due to an order of the court entered as part of a proceeding apparently procedurally agreed to by the parties.  The material's existence, or . . . William[s]'s cooperation in this regard, appears never to have been disclosed to the [d]efense.  While a direct appeal could have been taken by trial counsel in theory, it does not appear that there was an actual decision order to appeal.  In [defense counsel's] letter [seeking reconsideration of the December 24, 2018 decision], he represents that the MS13 materials were produced to co-defendants in their subsequent trial.[]  He further represents that appellate counsel from the Public Defender's office chose not to address the issues surrounding the in camera reviews on direct appeal.  While this court was not provided with the complete appellate submissions in this matter, the State does not dispute [defense counsel's] assertion and it does not appear that the issues raised by [d]efendant concerning . . . Williams were addressed on appeal.[]

18

> Pursuant to [Rule] 3:22-11 this court has the ability on an application for Post Conviction Relief ("PCR") to allow defendant forty[-]five . . . days to file a direct appeal. While the instant application is one for a new trial, the court chooses, sua sponte, to treat [d]efendant's arguments concerning the failure to provide information concerning . . . William[s]'s cooperation with the federal authorities (in any regard, including the SSC and MS13) as a PCR application seeking leave for appellate review of these issues. This is believed to be a just result as it appears that the timing of [d]efendant's receipt of information pertinent to [d]efendant making an informed decision on the propriety of appealing the issue did not occur until after the time for a direct appeal had passed. The court therefore invokes R[ule] 1:1-2 to secure a just determination, simplify procedure and eliminate unjustifiable delay in this regard.

The motion judge also rejected defendant's arguments regarding Roland's guilty plea for the same reasons expressed in the December 2018 decision. The judge added that "Roland's plea to what was undisputed at [d]efendant's trial is cumulative of what was presented and is not evidence likely to alter the outcome of the trial."

In defendant's counseled brief on this appeal, he raises the following points:

> POINT I. THE MOTION COURT SHOULD HAVE GRANTED DEFENDANT A NEW TRIAL BECAUSE THE STATE VIOLATED BRADY, . . . AND ALSO IN ACCORDANCE WITH STATE V. CARTER, 85 N.J.

19

300, 314 (1981), FOR NEWLY DISCOVERED EVIDENCE.

    A.   The State Was Required To Timely Produce The Requested Material Concerning Lewis's Involvement In The South Side Cartel And Williams' Cooperation Under Brady . . . , and R. 3:13-3(B).

        1.  Vendas's Notes of First Interview With Williams.

        2.  Williams's Letters to Law Enforcement.

        3.  Excerpt of March 7, 2013 Grand Jury Testimony of Williams in USA V. John Doe.

    B.   The Motion Court Should Have Granted Defendant's Motion For a New Trial Based On Newly Discovered Evidence.

    C.  At a Minimum, There Should Be A Remand For an Evidentiary Hearing For The Court to Substantively Address Defendant's Arguments Other Than The Newly Discovered Evidence Of Farad's Plea.

POINT II.  IF DEFENDANT'S CONVICTIONS ARE NOT VACATED, THE TRIAL COURT MUST CONDUCT A RESENTENCING IN ACCORDANCE WITH THIS COURT'S RULING.

Defendant's pro se supplemental brief raises the following points:

POINT I.  THE MOTION COURT SHOULD HAVE GRANTED DEFENDANT A NEW TRIAL BECAUSE THE STATE VIOLATED BRADY . . . .

A. THE PROSECUTION KNOWINGLY ALLOWED WILLIAMS TO PERJURE HIS TESTIMONY THAT NO LAW-ENFORCEMENT AGENCY AND/OR PROSECUTOR'S OFFICE MADE ANY PROMISE TO HIM IN RETURN FOR HIS COOPERATION.

B. THE PROSECUTION KNOWINGLY ALLOWED WILLIAMS TO PRESENT FALSE TESTIMONY TO THE JURY AS TO THE PROMISES MADE TO HIM AND BENEFITS HE RECEIVED AS PART OF HIS [FIFTEEN] YEARS WITH [EIGHTY-FIVE] PERCENT PLEA DEAL.

C. NEW TRIAL SHOULD BE GRANTED BECAUSE THE CUMUL[A]TIVE EFFECT OF THE [BRADY] VIOLATIONS CAUSED THE DEFENDANT TO RECEIVE AN UNFAIR TRIAL.

POINT II. THE PROSECUTION ARGUMENT SINCE IT WITHHELD THE [BRADY] MATERIAL WITH THE APPROVAL OF THE TRIAL COURT NO [BRADY] VIOLATION CAN BE ESTABLISHED, OR ALTERNATIVELY IT PROVIDES THE [BRADY] MATERIAL, THE TRIAL COURT WOULD HAVE RULED IT INADMISSIBLE IS CLEARLY WITHOUT MERIT.

POINT III. THE PROSECUTION'S ARGUMENT BECAUSE WILLIAMS WAS HEAVILY IMPEACHED DURING DEFENDANT'S TRIAL ANY ADDITIONAL IMPEACHMENT EVIDENCE IS IMMATERIAL, IS WITHOUT MERIT.

21

Defendant's second pro se supplemental brief raises the following point:

> POINT I. STATE KNOWINGLY SUPPRESSED IMPEACHMENT EVIDENCE OF THE PROSECUTION'S KEY WITNESS IN VIOLATION OF BRADY[] DENYING DEFENDANT A FAIR TRIAL.

## I.

"[A] motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown." State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000) (citations omitted). "Appellate review is limited to a determination of whether the trial court could reasonably have reached the findings it made based on 'sufficient credible evidence . . . in the record.'" State v. Van Ness, 450 N.J. Super. 470, 496 (App. Div. 2017) (alteration in original) (quoting State v. Brooks, 366 N.J. Super. 447, 454 (App. Div. 2004)).

Generally, motions for a new trial based on newly discovered evidence are disfavored and granted with caution because they disrupt the judicial process. State v. Conway, 193 N.J. Super. 133, 171 (App. Div. 1984). A motion seeking a new trial based on newly discovered evidence, requires that

> defendants must show that the evidence (a) is material, and not merely cumulative, impeaching, or contradictory; (b) was discovered since the original trial, and was not discoverable by reasonable diligence

22

prior thereto[;] and (c) is of the sort which would probably change the jury's verdict if a new trial were granted.

[Ibid. (quoting Carter, 85 N.J. at 314).]

Evidence is material if it would "have some bearing on the claims being advanced." State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1997) (quoting Korostynski v. Div. of Gaming Enf't, 266 N.J. Super. 549, 555 (App. Div. 1993)).

In Brady, the Supreme Court of the United States held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "Due process requires that the State disclose information it possesses which is material to the defense, even where it concerns only the credibility of a State's witness." State v. Spano, 69 N.J. 231, 235 (1976) (citations omitted).

"In order to establish a Brady violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence is favorable to the defense; and (3) the evidence is material." State v. Martini, 160 N.J. 248, 268-69 (1999) (citing Moore v. Illinois, 408 U.S. 786, 794-95 (1972)). "Nondisclosure of evidence favorable to the accused violates the constitutional

23

right of due process only 'where the evidence is material to guilt or punishment.'" State v. Carter, 91 N.J. 86, 112 (1982) (quoting Brady, 373 U.S. at 87). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).

In points I and II of his counseled brief, points I, II, and III of his pro se brief, and point I of his second pro se brief, defendant argues the trial court erred by failing to find Brady/Carter violations for the State's failure to timely produce exculpatory and impeachment evidence, namely, Vendas's notes, Williams's letters to law enforcement, and Williams's grand jury testimony in the federal case. At the outset, as we noted, we have already addressed and rejected as without merit defendant's arguments relating to Vendas's notes. Bond, slip op at 17. For these reasons, we decline to revisit this issue.

Defendant argues the motion judge should have granted a new trial because of the State's failure to provide a transcript of Williams's testimony before a federal grand jury in the MS13 prosecution. He asserts Williams's testimony "connected Lewis to the [SSC], which was an important piece to defendant's duress defense" and the information was exculpatory and material.

24

Defendant argues Williams's testimony would have corroborated his own testimony about Lewis and the SSC.

Williams told the grand jury he met with an AUSA at the Union County Prosecutor's Office and the attorney advised Williams he could not promise anything with respect to his pending case. However, the AUSA told Williams he would make known to whomever his attorney deemed appropriate the fact that he had cooperated.

The transcript of Williams's testimony does not mention the SSC or Lewis and does not support the argument Williams's testimony would have corroborated defendant's duress claim. Moreover, Williams's testimony was part of an unrelated federal proceeding and there is no indication the State was in actual or constructive possession of the transcript during or after defendant's trial. The testimony provided no additional information and would not have affected the outcome. Therefore, the federal grand jury transcript lacked the materiality required under Brady and the motion judge did not abuse his discretion.

Defendant argues the court erred by denying his motion for a new trial pursuant to Carter due to the State's failure to timely produce the following: Williams's 2014 sentencing transcript, the 2015 transcript of his interview with

25

State and federal law enforcement, and his 2016 trial testimony in a federal trial; and the transcripts of Roland's guilty plea and sentencing. Defendant claims Roland's admission during the guilty plea that he killed Billups was "strong evidence" of duress, which would "probably change the jury's verdict." He also argues Williams's sentence and his testimony in a federal matter were relevant because it showed he cooperated in return for a "significant and unusual benefit."

These arguments lack merit. Roland's guilty plea was immaterial because it was cumulative, and we are unconvinced the information would have changed the jury's verdict because evidence relating to the SSC, Roland, and Billups's murder was already in evidence for the jury to consider. Williams's and Roland's sentencing transcripts were not material because they did not exist at the time of trial. Williams's testimony in the federal case was also cumulative because the jury here already heard testimony alleging Lewis was a member of the 793 gang, he cooperated with the government in another SSC case, he made threats against defendant in jail through other gang members, and that some members of the SSC were violent criminals.

Although defendant did not brief his arguments regarding Williams's 2015 recorded interview with law enforcement and the AUSA, the redacted transcript

of the interview in the record confirms the AUSA offered to write a letter to the judge about Williams's cooperation, which also is cumulative and not material. As the motion judge noted, Williams testified in defendant's case that he was cooperating "with other jurisdictions" with the hope it would lead to a reduction of his sentence.

We reach a different conclusion regarding the matter of Williams's letters. As we noted, the motion judge found there was no order entered by the trial judge adjudicating defendant's claims regarding the late provision of Williams's letters detailing his cooperation. He also noted the State did not disclose the cooperation or the nature of the cooperation to the defense before trial. The motion judge further noted this was an issue that was not raised on the initial appeal and essentially created an avenue for appeal by citing Rule 3:22-11, but did not adjudicate the issue.

Rule 3:22-11 states:

> The court shall make its final determination [on a PCR] not later than [sixty] days after the hearing or, if there is no hearing, not later than [sixty] days after the filing of the last amended petition or answer, with discretion to extend the final determination an additional [thirty] days, if approved by the Criminal Presiding Judge. In making final determination upon a petition, the court shall state separately its findings of fact and conclusions of law, and shall enter a judgment, which shall include an appropriate order or direction with

27

respect to the judgment or sentence in the conviction proceedings and any appropriate provisions as to rearraignment, retrial, custody, bail, discharge, correction of sentence, or as may otherwise be required. When a defendant raises a claim pursuant to [Rule] 3:22-2(e), the court is authorized to allow defendant [forty-five] days from entry of an order granting defendant's petition for post-conviction relief to file a direct appeal.

We have stated: "Petitions for post-conviction relief cannot be disposed of out of hand." State v. Odom, 113 N.J. Super. 186, 189 (App. Div. 1971); see also State v. Flores, 228 N.J. Super. 586, 590 (App. Div. 1988) (citing Rule 3:22-11 and noting a "prefer[ance for] a more detailed statement of reasons supporting [a PCR court's] determination" rather than "summary treatment of the questions raised by defendant in his petition.").

Here, despite the motion judge's acknowledgement there was no disposition of defendant's claims regarding Williams's letters by the trial judge, the motion judge failed to make findings of fact and conclusions of law of his own as required by Rule 1:7-4 and Rule 3:22-11. Instead, citing Rule 3:22-11, the judge seemingly granted defendant an avenue of appeal without disposing of the issue of Williams's letters. Our jurisdiction is defined by Rule 2:2-3, which requires trial courts to dispose of all issues before we can consider them. A trial court cannot vest jurisdiction upon us. For these reasons, we remand

defendant's claims of <u>Brady</u>/<u>Carter</u> violations relating to Williams's letters to the motion judge for reconsideration, including whether there should be an evidentiary hearing. In doing so, we express no opinion on the merit of defendant's claims relating to Williams's letters or if there should be an evidentiary hearing.

Defendant's arguments that the State suborned perjury and false testimony lack sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2). To the extent we have not addressed any other argument raised by defendant it is because it lacks merit as well.

II.

Finally, defendant argues that if his convictions are not vacated, the matter should be remanded for resentencing in accordance with our prior decision. The State agrees. For these reasons, the matter is remanded for resentencing in accordance with our decision on the initial appeal.

Affirmed in part and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3597-18